Filed 1/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039779 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS120448) |
| v. | |
| ANTONIO ALMANZA, | |
| Defendant and Appellant. | |

Defendant appeals from a judgment arising out of sex crimes against a girl. The trial court made serious mistakes by failing to adequately inquire into and police the prosecutor's conduct after the prosecutor threatened to prosecute the defense investigator and insinuated that defense counsel could also be prosecuted, in each case for reasons both parties now agree would have been groundless. Defense counsel also failed to do all he could to safeguard defendant's right to the effective assistance of counsel when this occurred. We would reverse the judgment and remand for retrial with a defense team not under this sword of Damocles, but, as we explain in part I of our discussion, *People v. Doolin* (2009) 45 Cal.4th 390 (*Doolin*), compels us to affirm it. In part II of our discussion, we raise the question whether our Supreme Court intended for *Doolin* to apply in these circumstances and suggest an alternative approach.

## PROCEDURAL BACKGROUND

An information charged Antonio Almanza with four counts of a nonforcible lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subd. (a)),[1] three counts of forcible sodomy (§ 286, subd. (c)(2)), and one count of a forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)(1)).

Defendant waived his right to a jury trial.  Following a contested trial to the bench, the court adjudged him to be guilty of the lewd-act counts but not guilty of the sodomy counts.

The trial court sentenced defendant to an aggregate term of 16 years in state prison.

## FACTS

### I.     *Prosecution Case*

Jane Doe, a teenager at the time of trial, had three brothers.  The children all lived under the same roof as their mother, A.A., and defendant.  Jane was the second-oldest child.  When Jane was a baby, defendant moved into the house to be with A.A.  Defendant and A.A. never married, but Jane and her brothers regarded him as their stepfather.

Jane Doe testified at length.  Defendant started to sexually molest her when she was around seven or eight years old, and continued until about two weeks before his arrest, which occurred when Jane was 12.  Once when Jane was taking a shower in the master bathroom, defendant opened the shower door and inserted his finger in Jane's vagina.  Jane, too young to understand the import of this act, laughed because at the time she thought it was "funny."

---

[1] All statutory references are to the Penal Code.

Over the next several years, defendant repeatedly inserted his penis in Jane's vagina and between the cheeks of her buttocks. The molestations would occur while Jane and defendant were alone, usually in the master bedroom while the television set was on, and always on weekends. Once, in early 2012, while defendant and Jane were alone in the living room, defendant placed Jane's hand on his penis and moved her hand up and down. On other occasions defendant manipulated Jane's breasts. These acts were done against her will.

After the authorities discovered what was happening, Jane was interviewed at a police station and a hospital. The trial court listened to recordings of the interviews. Jane also made a so-called pretext telephone call to defendant from the police station and the court listened to the recording of the call. The transcription of the call includes the following exchange:

"[Jane Doe]: . . . you touched me.

"[¶] . . . [¶]

"[Defendant]: And who did you tell?

"[¶] . . . [¶]

"[Defendant]: You know what's going to happen, right?

"[Jane Doe]: No.

"[¶] . . . [¶]

"[Defendant]: OK. The same thing is going to happen as the time with, with [your brother A.M.]. If you're talking to somebody, or if you told somebody.

"[Jane Doe]: You put your penis down my vagina.

"[Defendant]: So what?

"[¶] . . . [¶]

"[Jane Doe]: You, you did it to me.

"[Defendant]: Ahhh . . . .

"[Jane Doe]: You know what I'm talking about.

"[Defendant]: No.

"[Jane Doe]: You don't have to lie!

"[Defendant]: When?

"[Jane Doe]: . . . You touched me. Tell the truth.

"[Defendant]: OK bye, bye. Don't tell anyone, OK?"

Defendant's reference to Jane's brother regarded physical child abuse Jane's mother A.A. had committed. A.A. beat Jane, her brother A.M., and another brother with a belt in 2006. The children were removed from the home by child welfare authorities. A.A. was convicted of child abuse and served a few days in county jail.

As Jane made the pretext call, police were waiting outside the family's house. One officer knocked on the front door and asked if defendant was home. Defendant ran out the back door and tried to jump over a boundary fence but was apprehended.

Over the next several months, Jane was interviewed three times by defense investigators—twice by Gregory Lepore and once by Mark Zorne. The first interview was with Lepore, and Jane described the molestations in much the same way she had described them to authorities. In the other two interviews, one with Lepore, one with Zorne, Jane recanted her accusations.

Jane's mother A.A. was present during the interview with Zorne but not during those with Lepore. The prosecutor asked Jane, "[W]hen you spoke to Mr. Zorne, was your mom with you, was she sitting there with you while you and he was [*sic*] talking about this?" Jane answered, "Yeah." The prosecutor then asked Jane about "your relationship with your mom" in these terms: "Prior to telling [your friend] and having [child welfare authorities] become involved and the officers and this whole case starting, you didn't tell your mom?" Jane answered no, and that a child welfare worker had informed her mother of her allegations. The prosecutor turned to another line of inquiry, asking Jane if she "remember[ed] a case where your mom hurt you," and Jane replied, "She hit me with a belt" and struck two of her brothers too.

4

On cross-examination, defense counsel pursued the theory that Jane wanted revenge against defendant for other reasons, and she admitted that he would spank her for legitimate disciplinary reasons and that his doing so angered her.

At the outset of cross-examination, the defense attorney played recordings of Jane's second and third interviews with the defense investigators. In both interviews—those in which Jane recanted—she said defendant had not abused her. She had lied about the molestations because she was angry at defendant for having disciplined her when she failed to do her homework. She denied to Lepore that her mother was influencing her to recant.

Also on cross-examination, the defense brought out a number of discrepancies between Jane's extrajudicial and in-court statements. Jane testified she had lied when she told Lepore she had described the molestations to two of her friends. In fact, she had only told one of the friends about them. She had lied when she told Zorne she had gotten the idea about accusing defendant from a television show. She had told a police officer that defendant had raped her 17 times, whereas in fact he had raped her three or four times. She told her interviewer at the hospital that defendant's penis had penetrated her rectum three times, causing pain, but testified at trial that this had not occurred. (As noted, the trial court acquitted defendant of the three forcible sodomy charges.) In addition, her trial testimony was inconsistent in a minor respect: on direct examination, she had testified that defendant had lived with the family for four or five years, when in fact he had lived with the family for about 12 years, ever since she was a baby.

## II.     *Defense Case*

Defendant testified and denied committing any crimes against Jane. The two were never alone in the master bedroom. None of the children was permitted to take showers in the master bedroom. He sometimes had to discipline the children because A.A., who had been convicted of beating some of them with a belt, could not do it.

Defendant knew that the telephone call was a pretext call, which he thought was being engineered by social workers. It was on that basis that he told Jane not to talk to people about family business. He denied running out of the house when a police officer came to the door after the pretext call ended. Instead, he had been fixing a vacuum cleaner in the back yard.

Lepore, the defense investigator, testified about his two interviews of Jane. The first was at Jane's house. A.A. was at home but did not attend it. In that interview, Jane said she had been sexually molested by defendant many times, but had trouble remembering dates. Jane said she had told her friend "her stepfather had put his penis inside her vagina and butt." She then corrected herself to state "there was one occasion when the penis was inserted in the butt" but he had not attempted to rape her. Defendant sodomized Jane one more time, Lepore recollected her as telling him.

The second interview occurred because A.A. had telephoned defense counsel and said Jane wanted to recant, so Lepore returned to the house. During that interview, which Lepore recorded, Jane denied being molested and said she had falsely inculpated defendant, relying on ideas she obtained from watching a television show, because defendant "was upset with her that she hadn't performed well on a particular school project" and "had spanked her." As with the first Lepore interview, A.A. was at home but elsewhere in the house during the interview.

A.A. gave detailed testimony. She confirmed she had attended only Jane's third interview, the one with Zorne. She denied trying to influence her daughter during that interview, in which Jane recanted her accusations against defendant. She remembered only "bits and pieces" of what was said during her daughter's interview with Zorne.

A.A. also testified that she had spent four days in jail in 2006 after beating her children with a belt. She had had difficulty disciplining the children, and Jane was disobedient and rebellious and had a learning disability.

6

A.A. further testified that although she had never questioned defendant about her daughter's allegations, she did not believe he had harmed her, although Jane showed signs of premature sexualization; before fifth grade she had "started wearing makeup and having boyfriends behind my back." A.A. was laid off from her job in February of 2011 and did not find new work until December of 2012, so she stayed home with the children most of the time, while defendant worked outside the house. At other times, defendant was not at home at all, either because A.A. had thrown him out (one such exile lasted about six months, from April to October of 2010) or because he was away to work on construction projects. A.A. was at home on weekends, which is when Jane stated most of the molestations had occurred, although the children could be alone with defendant for two-hour periods, notably on one Saturday a month. Defendant had spanked Jane for legitimate disciplinary reasons the night before Jane told her friend that he had been sexually abusing her.

Jane, A.A. also testified, had been caught cheating on her homework and defendant had spanked her for doing so. Jane later told her mother she had falsely accused defendant because she was mad at him. A.A. had never seen Jane watching a movie with defendant, and the children were prohibited from entering the master bedroom. There was an exception: the children occasionally used the master-bedroom shower, but not until recently.

A.A. testified that she and Jane were summoned to the prosecutor's office for two interviews there. At the outset of the first one, Jane told the prosecutor she had lied. (A.A. did not know what the lie referred to.) This was in A.A.'s presence. The prosecutor then asked A.A. to leave. He also asked her to step out of the room for the second interview.

A.A. feared what she perceived to be her daughter's power over her. "This conviction . . . has haunted me since 2006. Has made me look like I am the worst mother in the world." "I'm scared that if I keep telling her not to wear makeup she's going to go

7

to the teacher or . . . the police and say that I'm being mean to her." On cross-examination, she testified that her children "control me. I can't help it. They control me." A.A. testified on redirect examination that both she and defendant were potential victims of Jane's ability to falsely accuse them of misdeeds if they tried to discipline her for wearing makeup or cheating in school.

On cross-examination, the prosecutor established that A.A. remained close to defendant, catching her in a trap as he established this. After getting her at the outset to describe defendant as her "ex," someone she had visited in jail four or five times, the prosecutor offered to show her jail records listing 12 visits, including one within the last two weeks. A.A. conceded the point, but tried to explain away the visits by saying they were for the benefit of a son she took with her. "It's not me visiting him. I took my son," she testified.

Jane's brother G.M. testified that he and his siblings were always placed with a babysitter or at a Boys' and Girls' Club when their mother was working, and the children were never alone with defendant on weekends. (A.A. had also testified that the club was a destination for the children when they were not in school.)

Another brother, the aforementioned A.M., testified similarly to his brother. His mother ordinarily would place the children with a babysitter or at the Boys' and Girls' Club when she worked. Although A.M. could be alone with defendant, that was only when defendant was taking A.M. to defendant's workplace at construction sites on weekends and during the summer school vacation. Jane did not go on these trips; she always went to the Boys' and Girls' Club. A.M. never saw defendant and Jane alone in the master bedroom. Jane had once told him, however, that defendant had "raped" her.

### DISCUSSION

Defendant claims defense counsel labored under conflicts of interest between defendant's interests and those of counsel and counsel's investigator, counsel rendered ineffective assistance of counsel in failing to recognize and deal adequately with the

8

conflicts, and the trial court failed to protect his rights in the face of the conflicts, all in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution. He also discerns violations of his constitutional rights to compulsory process under the Fourteenth Amendment and to a fair trial, evidently under the Fifth and Fourteenth Amendments and article I, section 15, of the California Constitution.

We agree that the prosecutor precipitated a serious conflict of interest between defendant and defense counsel, a conflict the trial court did little to try to remedy and that defense counsel could have done more to address, and would reverse the judgment, except that *Doolin*, *supra*, 45 Cal.4th 390, compels us to affirm it. On direct appeal, defendant's other claims are without merit, because the record cannot supply an adequate factual predicate for them.

"It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 168 (*Rundle*), overruled on another point in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

The relevant events unfolded just before the bench trial began. Defense counsel informed the trial court that the prosecutor was threatening to prosecute a defense investigator. The prosecutor did not dispute this and made statements insinuating that defense counsel could be prosecuted too.

The imbroglio arose because the prosecutor surmised that (1) it was unlawful for defense counsel to retain an investigator, Mark Zorne, who had not been duly licensed by the state and for Zorne to serve as an investigator without the proper credentials, and (2) it was unlawful for defense counsel to have provided Jane Doe's true name to Zorne

9

and for Zorne to have uttered that name to Jane Doe herself during his interview with her, which he recorded and in which she recanted her accusations.

In a closed proceeding, the trial court summarized what was evidently an unreported earlier conversation: "Something came up this morning and there was an objection to Mr. Klopfenstein [defense counsel] designating . . . [¶] . . . [¶] Mr. Zorne as his investigating officer. The objection is based upon the fact that he is not a licensed investigator. [¶] . . . [T]he issue also came up that the prosecutor was concerned that Mr. Zorne's interview of the victim on behalf of Mr. Klopfenstein perhaps violated some law involving licensing for investigators."

Defense counsel said the prosecutor "said . . . he was going to be prosecuting Mr. Zorne, not just concerns. I think the record was pretty clear in that area. [¶] I understand the Court being very careful in its wording, but just so the record is clear, I believe that Mr. Hornik [the prosecutor] indicated that he was going to prosecute him. Told me before the court even came out and took the bench. I went out and had a conversation with Mr. Zorne and told him that, in fact, there was a possibility he was going to be prosecuted."

The prosecutor did not deny this, and proceeded to imply that defense counsel also could be prosecuted. "[T]he idea . . . that the child was formally identified and documented to what may be someone"—evidently Zorne—"who is not entitled [to] that information is of significant concern to the People. [¶] So that's what I discussed with Mr. Klopfenstein about potential for prosecution for his disclosure of—for the investigator's disclosure of confidential information."

Just before, the prosecutor had stated: "The specific concern I had [about] an unlicensed, unregistered, presumably unbackgrounded investigator was Penal Code Section 293. The victim has been throughout designated as 'Jane Doe.' She is confidential. If that information was disclosed to a party who was not entitled to it, that's a crime. [¶] [Zorne] identifies her by name and date of birth in the interview."

10

Neither defense counsel nor the trial court asked the prosecutor to clarify if defense counsel was under threat of prosecution. The court did not ask the prosecutor if he intended to prosecute Zorne. The court did not stop the proceedings and ask the parties to brief whether defense counsel, Zorne, or both had committed a crime.

Instead, defense counsel responded to the prosecutor's courthouse and in-court menacing by agreeing not to call Zorne as a witness. On a witness list dated just the day before, the defense had listed Zorne. But now counsel discounted Zorne's value as a prospective witness, telling the trial court and prosecutor, "His participation in the case was only that he conducted an interview I believe on January 6th of 2013 in my office where he interviewed Jane Doe, the victim. [¶] And I believe the interview is probably about maybe 10 minutes or so where she denies that anything happened." Defense counsel thus implied Zorne would be called only to authenticate the recording, and the prosecutor opined during the same hearing that Jane Doe could authenticate it, obviating the need for Zorne to testify.

The trial court expressed concern that defendant not be deprived of a material witness and his right to present a defense but summarized, "based on the representation that Mr. Zorne's sole participation and the subject of any potential testimony would be simply to authenticate the recorded interview of the victim, the Court feels as if it does not need to go any further into this matter, feels confident that that recording will be introduced into evidence, authenticated appropriately, a transcript will be provided. So there will be deprivation [*sic*: no deprivation] of testimony on behalf of the defendant."

At no point did the trial court solicit defendant's views on this issue, although he was present during the closed hearing. It did not ask him if he waived any conflict of interest. Nor did it appoint independent counsel to help elicit defendant's views or advise him on a waiver. The proceedings contrast with those in *People v. Mai* (2013) 57 Cal.4th 986 (*Mai*). There, "the court perceived a possible conflict of interest and, as the cases require, it addressed the issue with considerable care." (*Id*. at p. 1010.) This included a

laborious obtaining of the defendant's waiver of any rights under the law of conflict of interest—a waiver available under state law (*ibid.*) and one that the high court found valid in *Mai* (*id.* at p. 1012). The trial court in *Mai* also "appointed independent counsel to investigate and advise defendant on the subject, and confirmed that independent counsel had done so." (*Id.* at pp. 1010-1011.) As *Mai* elaborated, "Before taking defendant's waiver, the court warned him of the essential danger of conflicted representation, i.e., that the conflict might induce counsel to 'pull their punches' when representing him in the instant case. It was further agreed on the record that defendant could withdraw the waiver at any time if a conflict actually materialized and he perceived it was affecting his counsel's performance. Hence, it appears defendant was generally apprised of the considerations that should influence his waiver decision." (*Id.* at p. 1011.) The trial court in *People v. Ramirez* (2006) 39 Cal.4th 398, 428, employed similar safeguards, including an offer of independent counsel to the defendant.

On appeal, the parties inform us that the prosecutor's suspicions were legally baseless, and during the closed hearing the prosecutor himself admitted that "this is terra incognita," "I've never been confronted with this particular situation," and "I had less than an hour or so of working time to deal with that."

**I.**

Federal constitutional principles apply to California law when an appellant claims counsel provided ineffective assistance because of the burden of an active conflict of interest. (*Doolin*, *supra*, 45 Cal.4th at p. 421.) As is well known, an ineffective assistance of counsel claim requires a reviewing court to address a deficient-performance prong and a prejudicial-outcome prong. (*Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).)

### A.    *Deficient Performance*

"In the context of a claim of conflict of interest . . . the deficient-performance prong of the *Strickland* test is satisfied by a showing that defense counsel labored under

12

an actual conflict of interest, that is, 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' " (*Rundle*, *supra*, 43 Cal.4th at p. 169, italics deleted.)  In other words, defendant must show that the conflict (a) existed and (b) had some palpable, real effect on the trial, i.e., the " 'actual conflict of interest adversely affected his lawyer's performance.' " (*Strickland, supra,* 466 U.S. at p. 692.)

" 'In determining whether a defendant has demonstrated the existence of an actual conflict of interest satisfying the first prong of the analysis [i.e., deficient performance], we consider whether 'the record shows that counsel "pulled his punches," i.e., failed to represent defendant as vigorously as he might have had there been no conflict.' [Citation.]  And yet we must bear in mind, as we observed in *People v. Roldan* (2005) 35 Cal.4th 646, 674 . . . , that when ' "a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission.  We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." ' " (*Rundle*, *supra*, 43 Cal.4th at pp. 169-170.)

Here, we have no trouble concluding there was a conflict of interest that was real, not theoretical.  Any trial counsel in a criminal case who is worried that the prosecutor is scrutinizing his or her actions for possible criminal investigation and/or prosecution has a conflict with the interest of representing the client zealously—he or she does not want to antagonize the prosecutor.  The conflicting interests here are certainly as obvious as those our Supreme Court identified in *People v. Friend* (2007) 47 Cal.4th 1.  In that case, defense counsel's office had represented a prosecution witness and so the trial court constrained the defense's ability to cross-examine that witness.  (*Id*. at pp. 45-46.)

We also conclude without difficulty that defendant has met his burden to show that unconflicted counsel would have done more for him and that defense counsel did "pull his punches," so to speak.  As defendant observes in his opening brief, "If the

13

authentication of a recording had been the only relevance of Zorne's testimony"—testimony defense counsel agreed to forgo once the prosecutor had ruminated about prosecutions within the defense team—"then there would not have been a problem. But that was not the case. The prosecutor sought to call into question the circumstances surrounding Zorne's recorded interview of Jane Doe by asking the court"—recall that the trial court here was also the trier of fact—"to infer that her recantation had been coerced."

Defendant is correct. The prosecutor, and the trial court itself, showing interest in this topic, adduced testimony from Jane Doe and from Jane Doe's mother A.A. that A.A. was present during the interview with Zorne. The prosecutor also adduced testimony that A.A. had used violence against the children to try to coerce them into obeying her. In addition, Jane Doe testified on cross-examination that her mother's presence during the Zorne interview was unnerving, although she backed away from that assertion when defense counsel asked her to confirm it. A.A.'s own testimony, adduced in part by the prosecutor (who, as noted, proved that A.A. visited defendant in jail more often than she had been willing to admit), showed her to have continued interest in defendant's companionship, and so her presence during the Zorne interview lent itself to casting suspicion on the genuineness of Jane Doe's recantation to Zorne of her accusations against defendant. If the sole purpose of Zorne's testimony was to perform a housekeeping chore that Jane Doe could do, one might wonder why he was on the witness list to begin with, a list that bore a date of just the previous day. As noted, when defense counsel implied Zorne would be called only to authenticate the recording, the prosecutor opined during the same hearing that Jane Doe could authenticate it. If Zorne could offer only inculpatory testimony in addition to his authentication testimony—e.g., that A.A. was glaring at Jane Doe with basilisk eyes as Jane was recanting—then calling him as a witness for the minor purpose of an authentication would have been risky.

In sum, it seems likely to us that Zorne would have provided some useful testimony for defendant. Perhaps he noticed, for example, that while Jane Doe was

14

recanting, A.A. was looking out the window, wandering about the room, absorbed in looking at a smart phone, or in some other manner showing indifference to the recantation, rather than willing or encouraging it as other evidence suggested. There could be no tactical reason to avoid having Zorne testify to any such indicia of indifference.

### B.   *Prejudicial Outcome*

In most attorney conflict of interest cases a defendant must show prejudice under the familiar standard of *Strickland*, *supra*, 466 U.S. 668, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (See *Rundle*, *supra*, 43 Cal.4th at p. 169.)

The other standard is one in which prejudice is presumed. That standard is found in *Cuyler v. Sullivan* (1980) 446 U.S. 335 (*Cuyler*). *Strickland* summarized the *Cuyler* standard and explained when it should apply, as follows:

"One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice [compared to cases in which the defendant effectively had no counsel, either literally or in a practical sense]. In *Cuyler v. Sullivan*, 446 U.S., at 345-350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties[,] [i.e., counsel's performance is deficient in a significant way]. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests[,] [i.e., the effect of the deficient performance]. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts [citation], it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above [i.e., complete denial of counsel's assistance or various types of state interference with it].

15

Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' *Cuyler v. Sullivan*, *supra*, 446 U.S., at 350, 348 (footnote omitted)." (*Strickland*, *supra*, 466 U.S. at p. 692.) We may call this the *Cuyler* presumed-prejudice standard.

In the key post-*Strickland* case of *Mickens v. Taylor* (2002) 535 U.S. 162 (*Mickens*), the court reiterated, explicated, and summarized the law as follows: "There is an exception to this general rule [requiring a showing of reasonable-probability prejudice under *Strickland*]. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. [Citations.] But only in 'circumstances of that magnitude' do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." (*Id.* at p. 166.)

Counsel's assistance here was not denied entirely or during a critical stage of the proceeding, so the prior paragraph is quoted only for context. It leads to the next point in *Mickens*, which is relevant to this appeal:

"We have held in several cases that 'circumstances of that magnitude' may also arise when the defendant's attorney actively represented conflicting interests." (*Mickens*, *supra*, 535 U.S. at p. 166.) In other words, prejudice is presumed in certain cases in which counsel actively represented conflicting interests, i.e., an actual conflict of interest. But, as stated in *Strickland*—here we repeat ourselves briefly—the appellant must also show the conflict had a palpable effect. Under *Cuyler*, *Mickens* continued, " 'an actual conflict of interest' meant precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties. It was shorthand for the statement in *Sullivan* [,] [i.e., *Cuyler*] that 'a defendant who shows that a conflict of interest actually

16

affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.' " (*Mickens*, *supra*, 535 U.S. at p. 171, italics deleted.)

The next question is whether there are any further limits on the types of active-conflict situations in which prejudice should be presumed, given that reversal of a judgment and remand for retrial is a strong and costly remedy. *Mickens* explains this: "The purpose of our [citation] and *Sullivan*[,] [i.e., *Cuyler*] exceptions from the ordinary requirements of *Strickland* . . . is . . . to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." (*Mickens*, *supra*, 535 U.S. at p. 176.) *Rundle* also answered this question: "As the high court pointed out in *Mickens*, the presumption of prejudice is a prophylactic measure established to address 'situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.' " (*Rundle, supra,* 43 Cal.4th at p. 173.) *Doolin* reaffirmed *Rundle* on this point. (*Doolin*, *supra*, 45 Cal.4th at p. 418.)

Whether the presumption of prejudice should be applied to afford defendant a remedy in this case also rests on the following additional consideration: "Only when the court concludes that the possibility of prejudice and the corresponding difficulty in demonstrating such prejudice are sufficiently great compared to other more customary assessments of the detrimental effects of deficient performance by defense counsel, must the presumption be applied in order to safeguard the defendant's fundamental right to the effective assistance of counsel under the Sixth Amendment." (*Rundle*, *supra*, 43 Cal.4th at p. 173.) If "the *Strickland* standard is not 'inadequate' in this case . . . no presumption of prejudice is called for." (*Ibid.*)

Were it not for certain language in *Doolin*, *supra*, 45 Cal.4th 390, we would conclude that the presumption of prejudice applies here. It cannot be known what other exculpatory evidence might have been available to be presented by counsel who was not laboring under this stark conflict of interest. "[T]he possibility of prejudice and the

17

corresponding difficulty in demonstrating such prejudice are sufficiently great" (*Rundle*, *supra*, 43 Cal.4th at p. 173) to require that "the presumption be applied in order to safeguard the defendant's fundamental right to the effective assistance of counsel under the Sixth Amendment." (*Ibid.*)

But *Doolin* laid down a further limitation in a bright-line rule that we must follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Having relied on *Rundle* some 10 pages before (*Doolin*, *supra*, 45 Cal.4th at p. 418, quoting *Rundle*, *supra*, 43 Cal.4th at p. 173), *Doolin* proceeded to make a separate, and, it appears to us, inconsistent statement—inconsistent with *Rundle* and the earlier statement in *Doolin*— about conflict-of-interest law. *Doolin* said that prejudice will be presumed only when counsel is representing multiple defendants concurrently and a conflict of interest arises from that circumstance. (*Doolin*, *supra*, 45 Cal.4th at pp. 428, 429.)

To reach this conclusion, *Doolin* relied on a federal decision, *Beets v. Scott* (5th Cir. 1995) 65 F.3d 1258 (*Beets*). *Beets* said: "The position adopted by this court *en banc* may be easily summarized. *Strickland* [in its traditional guise] offers a superior framework for addressing attorney conflicts outside the multiple or serial client context." (*Id*. at p. 1265, fn. omitted.) *Doolin* adopted the view of *Beets* and added to it. It announced the following rule: "a presumption of prejudice should be limited to the context of multiple concurrent representation because only in that context 'is the duty of loyalty so plain.' " (*Doolin*, *supra*, 45 Cal.4th at p. 428, quoting *Beets*.) "[W]e share the view of the Fifth Circuit Court of Appeals that *Strickland* provides the appropriate analytic framework for assessing prejudice arising from attorney conflicts of interest outside the context of multiple concurrent representation." (*Ibid.*) "We adopt the reasoning from *Beets* and therefore conclude that, because the asserted conflict does not arise from multiple concurrent representation, a presumption of prejudice is not appropriate in this case." (*Id*. at p. 429.)

18

We are bound by those direct statements.  The United States Supreme Court has said of its decisions:  "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  (*Rodriguez de Quijas v. Shearson/Am. Express, Inc*. (1989) 490 U.S. 477, 484.)  Deference to our Supreme Court's authority counsels that we must apply this rule to ourselves, even if the "other line of decisions" (*ibid.*) arguably includes *Doolin* itself (compare *Doolin*, *supra*, 45 Cal.4th at pp. 428, 429, with *id*. at p. 418).

Because defense counsel was not representing two or more defendants concurrently, under *Doolin*'s bright-line rule we apply the traditional *Strickland* prejudice standard to his claim.  He cannot prevail.  There was evidence from Jane that defendant sexually assaulted her and evidence from defendant implying acknowledgment of the truth of her account (at least in part) when he said "So what?" (*ante*, p. 3) in response to her accusation during the pretext call.  He ran from the house when the police arrived after the pretext phone call ended.  Conversely, there was evidence that Jane had a motive to fabricate her claims and that she been dishonest at times, including on such key matters as how often defendant purportedly had raped her and whether he had ever sodomized her.  Accordingly, it is possible that the outcome might have differed absent the conflict of interest.  But *Strickland* speaks not of possibilities, but reasonable probabilities.  Jane's inculpatory statements are buttressed by defendant's own inculpating statement and behavior.  There is no reasonable probability of a different outcome.  We will affirm the judgment.[2]

---

[2]  We also find unavailing defendant's compulsory-process and fair-trial arguments.  *Doolin* is directly on point, and we discern no way to conclude that the

*(footnote continued on next page)*

II.

"Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor.  That state official has the power to employ the full machinery of the state in scrutinizing any given individual.  Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life."  (*Young v. U.S. ex rel. Vuitton et Fils S.A.* (1987) 481 U.S. 787, 814.)[3]

In this case, the prosecutor put the defense under fear of prosecution, defense counsel withdrew his investigator as a witness, it is possible the investigator might have provided exculpatory testimony, and we do not know what other steps defense counsel

proceedings satisfied *Doolin* and yet violated other constitutional provisions.  For example, due process review often involves addressing a materiality component.  (See *Banks v. Dretke* (2004) 540 U.S. 668, 691.)  To succeed, a "a claim of prosecutorial violation of the right to compulsory process" (*People v. Jacinto* (2010) 49 Cal.4th 263, 269) also must meet a materiality requirement (*id*. at p. 270).  On direct appeal, when the question is what counsel might have done that counsel failed to do, an appellant would be hard put to show materiality—that is why, in the conflict of interest area, prejudice is sometimes presumed in these challenging circumstances.

Defendant also claims that the issues he has raised call for reversal on the ground of cumulative error even if none of them would require reversal on its own, but in light of our analysis, we find no merit to this claim either.

[3] In the same vein, United States Supreme Court Justice Robert H. Jackson observed, "The prosecutor has more control over life, liberty, and reputation than any other person in America.  His discretion is tremendous.  He can have citizens investigated . . . .  The prosecutor can order arrests, present cases to the grand jury in secret session, and . . . cause the citizen to be indicted and held for trial.  He may dismiss the case before trial, in which case the defense never has a chance to be heard.  Or he may go on with a public trial.  If he obtains a conviction, the prosecutor can still make recommendations as to sentence, as to whether the prisoner should get probation or a suspended sentence, and after he is put away, as to whether he is a fit subject for parole."  (Jackson, *The Federal Prosecutor* (Apr. 1, 1940), The Robert H. Jackson Center <http://www.roberthjackson.org/the-man/speeches-articles/speeches/speeches-by-robert-h-jackson/the-federal-prosecutor/> [as of Jan.. 13, 2015].)

might have forgone on behalf of defendant following the prosecutor's actions. We think that neither *Doolin*, *supra*, 45 Cal.4th 390, nor *Beets*, *supra*, 65 F.3d 1258,[4] contemplated this situation.[5]

In *Rugiero v. U.S.* (E.D. Mich. 2004) 330 F.Supp.2d 900, defense counsel "was the subject of a federal investigation during the pretrial and trial proceedings in Petitioner's case" (*id*. at p. 902) and "later pled guilty to conspiracy and tax charges." (*Ibid.*) The court reasoned that "the nature of the personal interest conflict in this case clearly demonstrates that the *Cuyler* analysis is appropriate and should be applied here.

---

[4] In addition, *Beets* is not immune from criticism. The Texas Court of Criminal Appeals disapproved of *Beets*. "The majority in *Beets* states plainly that 'The Supreme Court has not expanded *Cuyler*'s presumed prejudice standard beyond cases involving multiple representation.' The most obvious response to that observation, however, is that the Supreme Court has never expressly limited *Cuyler* to such cases either. Indeed, we found that, the only time the Supreme Court even considered the question of whether *Cuyler* is limited to a particular type of conflict, it concluded that the issue was 'an open question.'" (*Acosta v. State* (Tex.Ct.Crim.App. 2007) 233 S.W.3d 349, 354, fns. omitted.) *Acosta* went on to say: "While *Cuyler* was in fact a case of multiple representation, that fact is always secondary to the primary issue in all conflict of interest cases: whether the conflict asserted actually resulted in ineffective assistance of counsel to the defendant. *Beets*, in evaluating a conflict between a lawyer's self-interest and that of his client, concludes that *Cuyler* should apply only in the context of multiple representation because only in that context are the effects of breaching the duty of loyalty clear. We respectfully submit that the instant case, in which the appellant's trial counsel actively represented the interests of a third party during the appellant's trial, is a clear example of how the danger of ineffective assistance via a conflict of interest is not strictly limited to the codefendant context." (*Ibid*., fns. omitted.)

[5] Given that "cases are not authority for propositions not considered" (*People v. Mills* (2012) 55 Cal.4th 663, 680, fn. 12), it may be wondered why we do not simply declare that *Doolin* did not contemplate this situation and decline to follow it. The answer is the one we gave above: "If a precedent of this Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (*Rodriguez de Quijas v. Shearson/Am. Express, Inc*., *supra*, 490 U.S. at p. 484.)

[Citation.] The rationale behind *Cuyler*'s presumption-of-prejudice rule is (1) the high probability of prejudice arising from the conflict and (2) the difficulty of proving that prejudice. [Citation.] These two elements are present here. First, when an attorney is the subject of a criminal investigation by the same prosecutor who is prosecuting the attorney's client, there is a high probability of prejudice to the client as the result of the attorney's obvious self-serving bias in protecting his own liberty interests and financial interests. The liberty concern at issue is avoiding or minimizing imprisonment. The financial interests include avoiding disbarment and avoiding termination of the attorney's current representation of the client in question. The high probability of prejudice in this situation distinguishes this personal interest conflict from the weaker personal interest conflicts listed in the dicta in *Mickens*, e.g., book deals.[6] [Citation.] Second, such prejudice is difficult to prove because the client could be harmed by the attorney's actions or inactions that are known only to the attorney. In short, the personal interest conflict at issue presents comparable difficulties to situations involving concurrent representation conflicts." (*Id*. at p. 906, fn. omitted.)[7]

---

[6] The reference to book deals refers to a dictum in *Mickens* in which the court worried (*Mickens*, *supra*, 535 U.S. at pp. 174-175) about the federal Courts of Appeals applying *Cuyler* " 'unblinkingly' " (*id*. at p. 174) to what may be termed everyday conflicts involving relatively anodyne financial or personal interests. (*Ibid.*).

[7] At this juncture it is useful to take note of certain California Supreme Court decisions that involved circumstances different from those present here:

In *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, the circumstances were trivial compared to these: one defendant's family had given dress-out clothing to defense counsel that, unknown to counsel, contained heroin. (*Id*. at p. 308.) The defendant argued, to an unconvinced California Supreme Court, that defense counsel could have feared prosecution for this unwitting conduct as a " 'remote' " (*id*. at p. 309) possibility, despite "the prosecution's assurances to the judge that [counsel] bore no responsibility in the drug-smuggling incident." (*Id*. at p. 310.) Unsurprisingly, the court found this argument "strained." (*Ibid.*)

*(footnote continued on next page)*

Other cases applying *Cuyler* in these or similar circumstances are *Mannhalt v. Reed* (9th Cir. 1988) 847 F.2d 576, 578, 581, 583; *U.S. v. Knight* (6th Cir. 1982) 680 F.2d 470 (*per curiam*); *U.S. v. Cancilla* (2d Cir. 1984) 725 F.2d 867, 870; *U.S. v. Levy* (2d Cir. 1994) 25 F.3d 146, 157; *U.S. v. McLain* (11th Cir. 1987) 823 F.2d 1457, 1463-1464; *Thompkins v. Cohen* (7th Cir. 1992) 965 F.2d 330, 331; and *Foy v. U.S*. (E.D.N.Y. 1993)

---

In *People v. Friend*, *supra*, 47 Cal.4th 1, the Supreme Court found a conflict of interest but concluded, "there was no possibility of great prejudice arising from the conflict nor was there any difficulty in assessing its detrimental effect." (*Id.* at p. 46.) That was so because the conflict precluded defense counsel from cross-examining a prosecution witness with only one of 17 "criminal cases" (*id*. at p. 45)—she could and did impeach him with some or all of the other 16 (*id*. at p. 47)—and the boundaries of the conflict were well-understood during a hearing on it (see *id.* at p. 45).

In *Rundle*, *supra*, 43 Cal.4th 76, "Defendant does not contend that the conflict affected his counsel's performance related to their conduct of the trial itself, apart from counsel's reaction to [a] juror-misconduct issue . . . . As a result, the complained-of shortcomings of counsel in this case are fundamentally different from those found in typical conflict-of-interest situations. In most conflict cases, in which a conflict of interest affected the presentation of the defense case to the jury, the problem in assessing prejudice to the outcome of the proceeding has arisen from the reviewing court's difficulty in evaluating how extensively the conflict affected counsel's choices and, ultimately, in predicting how the presence or absence of certain evidence or arguments at trial would have affected the jury's deliberations and verdict." (*Id.* at p. 173.)

Finally, in *Roldan*, *supra*, 35 Cal.4th 646, overruled on another point in *Doolin*, *supra*, 45 Cal.4th at page 421, footnote 22, defense counsel declared a conflict because the defendant, on trial for his life, was threatening counsel's life. (*Roldan*, *supra*, at pp. 671-673.) The court held that because the appellant manufactured the conflict, and appeared to be doing so as part of disruptive "elements of his effort to delay the inevitable" (*id*. at p. 676), he could not complain on appeal. "There is something perverse in this argument," the *Roldan* court stated of the appellant's claim, "for although defendant unquestionably was entitled to the effective assistance of a conflict-free attorney, defendant's own behavior created the alleged conflict and threatened to undermine his lawyer's effectiveness." (*Id*. at p. 674; see *Cerro v. U.S*. (7th Cir. 1989) 872 F.2d 780, 785 [expressing similar views].)

838 F.Supp. 38, 45. (This does not mean that the cases always resulted in relief to an appellant; some concluded the appellant failed to show an actual conflict.)[8]

We agree with this statement: "What could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?" (*U.S. v. Cancilla, supra,* 725 F.2d at p. 870.) The trial court should have helped defendant to understand the problem, probably by appointing independent counsel; asked defendant, once he could make an informed decision, if he wished to waive the conflict of interest; and, if he refused, relieved his counsel. (See *U.S. v. Edelmann* (8th Cir. 2006) 458 F.3d 791.) *Edelmann* explained: "After [defense counsel] informed the government that both he and [co-counsel] would represent [defendant] during trial, the government notified the district court that the FBI was investigating [counsel] for fraud and that a criminal case against [him] was opened at the United States Attorney's Office for the Eastern District of Arkansas. The district court removed [him] as [defendant's] counsel after she refused to

_____

[8] Some cases present distinguishing circumstances and arrive at a different result. (*U.S. v. Montana* (7th Cir. 1999) 199 F.3d 947, 949 [it "is pure speculation" that counsel "pulled his punches"]; *Taylor v. U.S.* (*per curiam*) (6th Cir. 1993) 985 F.2d 844, 846 ["the investigation involving defense counsel was not conducted by the same office that was prosecuting [the defendant]"].) We have also found cases that failed to afford relief under circumstances we would find questionable. (*U.S. v. Jones* (2d Cir. 1990) 900 F.2d 512, 519 ["the prosecutor's hysterics were without foundation in fact or law" and "Allegations of wrongdoing alone cannot rise to the level of an actual conflict unless the charges have some foundation."]; see also *U.S. v. Balzano* (7th Cir. 1990) 916 F.2d 1273, 1293 [counsel's criminal problems unrelated to the defendant's]; *Cerro v. U.S.*, *supra*, 872 F.2d at p. 786 [defendant failed to show an actual conflict, in part because "There was no danger that authorities would learn something novel about [counsel's] possible involvement in criminal activities . . . ."].) There could be others we have not located that also would not agree with part II of our discussion. The law is, however, not a popularity contest; the question is which standard of prejudice is better applied in these circumstances, not which is more popularly applied, although the great weight of authority that we have found favors *Cuyler*.

24

waive a potential conflict of interest caused by the criminal case against [her counsel]." (*Id*. at p. 801, fn. omitted.)

## DISPOSITION

The judgment is affirmed.

_____
RUSHING, P.J.


I CONCUR:




_____
MÁRQUEZ, J.




**I CONCUR** IN THE **JUDGMENT ONLY**




_____
ELIA, J.




*People v. Almanza*
**H039779**


26

| | |
|---|---|
| Trial Court: | Monterey County<br>Superior Court No.: SS120448 |
| | |
| Trial Judge: | The Honorable Pamela L. Butler |
| | |
| Attorney for Defendant and Appellant<br>Antonio Almanza: | J. Wilder Lee<br>under appointment by the Court<br>of Appeal for Appellant |
| | |
| Attorneys for Plaintiff and Respondent<br>The People: | Kamala D. Harris<br>Attorney General |
| | Dane R. Gillette,<br>Chief Assistant Attorney General |
| | Gerald A. Engler,<br>Senior Assistant Attorney General |
| | Seth K. Schalit,<br>Supervising Deputy Attorney General |
| | John H. Deist,<br>Deputy Attorney General |

*People v. Almanza*
**H039779**