Filed 7/2/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS ALEJANDRO DOMINGUEZ et al.,<br><br>    Defendant and Appellant. | D076896<br><br><br><br>(Super. Ct. No. SCD271651; SCD277879) |

APPEALS from judgments of the Superior Court of San Diego County, Amalia L. Meza, Judge. Reversed and remanded.

Thomas E. Robertson, under appointment by the Court of Appeal, on behalf of Defendant and Appellant Luis Alejandro Dominguez.

Athena Shudde, under appointment by the Court of Appeal, on behalf of Defendant and Appellant Abraham Leal Torres.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Seth M. Friedman for Plaintiff and Respondent.

In a flurry of 21 bullets fired in 3.7 seconds, Luis Alejandro Dominguez and Abraham Leal Torres (collectively, Defendants) shot and killed Angel Sanabria and wounded Joseph Luna. They missed two others (Juan Coronado and Alberto Nava), who were in or near the same small enclosed area. All four victims were members or associates of the Eastside San Diego gang. Defendants were charged with the first degree murder of Sanabria and the premeditated attempted murder of Luna, Coronado, and Nava. No gang enhancements were alleged; Defendants were not gang members, but were admittedly part of a neighborhood "tagging crew" that had conflicts with the Eastside gang

The issue at trial was not who shot, but why. Defendants admitted they were the shooters. The issue was their state of mind. Each testified he fired in a panic and fear when, while about eight feet away from them, Sanabria said, "Where the fuck you from? . . . This is Eastside," and lunged at them while reaching for an apparent weapon in his waistband. The court instructed the jury on both self-defense and voluntary manslaughter based on imperfect self-defense. But it refused Defendants' request to instruct on voluntary manslaughter based on heat-of-passion, determining there was insufficient evidence of the requisite provocation.

Along with making true findings on certain gun enhancements, the jury convicted Defendants of second degree murder as to Sanabria (Pen. Code,[1] § 187, subd. (a)) and attempted murder as to Luna and Coronado (§§ 187, subd. (a), 664).[2] It found allegations that the attempted murders

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Torres alone was also charged with the attempted murder of J.T., who Torres allegedly pointed a gun at while fleeing the scene. The jury acquitted on that count as well.

2

were premediated to be "not true." It also acquitted Defendants of (1) first degree murder as to Sanabria; and (2) both attempted murder and attempted voluntary manslaughter as to Nava. The court sentenced Dominguez to a prison term of 16 years, plus 65 years to life and Torres to 17 years, plus 65 years to life.[3]

On appeal, Defendants contend the court erroneously refused their request to instruct on voluntary manslaughter based on heat of passion. Additionally, they assert that in light of *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), which was decided after trial, the court gave an erroneous "kill zone" instruction on the element of intent to kill for attempted murder. They further assert the evidence is insufficient to support their convictions on that theory.

We conclude the court erroneously refused to instruct on voluntary manslaughter based on heat of passion. Where, as here, the evidence can support not only self-defense and imperfect self-defense, but also that the defendant killed because his reason was obscured by passion in response to the victim's objectively provocative conduct, the trial court should instruct on all three theories. (*People v. Breverman* (1998) 19 Cal.4th 142 (*Breverman*).) In light of the Defendants' testimony, the jury should have been permitted to find Defendants guilty of voluntary manslaughter (instead of second degree murder) and attempted voluntary manslaughter (instead of attempted murder).

On the attempted murder convictions, the Attorney General concedes that "the trial court's kill zone instruction was prejudicially erroneous" under *Canizales*. We accept the concession, and also conclude that the evidence is sufficient to support attempted murder convictions on that theory.

---

[3]     Torres's extra year resulted from an unrelated case.

Accordingly, we will reverse the judgments and remand for a new trial on the reversed convictions.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Running the Streets Tagging Crew and the Eastside San Diego Gang.*

This case involves the Eastside San Diego (Eastside) criminal street gang and a tagging crew—Running the Streets (RTS)—that operated in the same neighborhood.[4] ; A tagging crew consists of two or more person who, using a common name (such as RTS), deface property with graffiti. In San Diego, there are approximately 200 different tagging crews. Although tagging crews do not have geographical boundaries (they will deface property anywhere), they tend to frequent a particular area.

RTS's primary criminal activity is spray painting graffiti. At the time of Sanabria's shooting, it had only four members, two of whom were Dominguez and Torres. Eastside is a full-fledged criminal street gang, with 237 documented gang members, plus at least another 250 individuals who associate with the gang. Its members engage in murder, attempted murder, assault, kidnapping, carjacking, and drug trafficking. They will not hesitate to use guns, knives, brass knuckles, and even baseball bats as weapons.

Sanabria was not an Eastside gang member, but associated with them. In 2014, he was convicted of assault with force likely to produce great bodily injury. On his way to jail Sanabria boasted, "I beat that Nigga's ass."

Coronado, Sanabria's cousin, also associates with Eastside. There was some evidence—not the least of which is a large "SE" tattoo on his chest— that he was affiliated with the Southeast Locos gang. In prison, he claimed

---

[4]    RTS was also called Respect the Shooter.

to be in Sureños.[5]  Luna is a "hard core" Eastside gang member, described by police as "Eastside to the very last bone."  He has prior felony convictions with gang enhancements for robbery and assault with a deadly weapon.[6]

Although a tagging crew is not a street gang, there are some similarities.  If a tagging crew is disrespected, it is expected that the members will respond with violence.  And like gang members, members of a tagging crew have monikers.  Dominguez's moniker is Creeps or Creeper, and he has RTS tattooed on a finger.  Police consider him to be a "tag banger"—a tagging crew member who is not just there for the art, but who also commits acts of violence on rivals.  Torres's moniker is Boozer and, like Dominguez, he also has RTS tattoos.

Eastside treats tagging crews as a training ground from which to acquire new talent.  Over the years, Eastside recruited (or completely absorbed) several tagging crews.  But like so much of gang life, recruiting tagging crew members has the potential for serious violence.  If a recruit were to refuse an invitation to join the gang, Eastside would consider that person a "rival" who would be "dealt with" for disrespecting the gang.  The prosecution's gang expert explained:

> "Q:  You testified . . . that the Diego Aztecs were at one point [ ] a tagging crew and then now there is no more Diego Aztecs that are individuals, right, they are just part of Eastside?
>
> "A:  Yes, sir.
>
> "Q:  And the truth for the Diego Aztec was that when [Eastside] came to ask them or tell them that they were going to be gang members, they had two choices, right, they

---

5      Sureños is a prison gang affiliated with the Mexican Mafia.

6      Nava, likewise, was an Eastside associate.

could either become [Eastside] or, in their words, they could get banged on, right?

"A: That would be accurate, yes.

"Q: If they did not join [Eastside], they would get dealt with, in your words?

"A: Yes.

"Q: And that means they would be targeted for assault, right?

"A: They would be viewed as rivals.

"Q: Or maybe they could be even targeted for killing, right?

"A: It could escalate to that, yes."

Historically, Eastside and RTS coexisted in the City Heights area of San Diego without conflict. But by 2017, there was "major conflict" between the two groups. After this rift, RTS members started carrying guns. Eastside sought to absorb RTS into the gang but Torres was not interested, testifying "I just like to do art." Dominguez knew that Eastside was "looking for" RTS members to assault.

B. *The Events Leading Up to the Shooting*

The Villa Escondido apartments in City Heights was a hub for Eastside. Gang member Edwin Garcia lived there, and his cohorts often gathered in front of the building. It is located within territory also frequented by RTS.

In the afternoon and into early evening of April 1, 2017, Sanabria, Nava, Coronado, Luna, and Garcia were listening to music, drinking beer, and smoking PCP-laced cigarettes in a small enclosed area by the trash dumpster at Villa Escondido.  A photo taken that day shows, from left to right, Nava, Coronado, Luna, and Garcia.  Garcia, holding a knife, also had a machete strapped to his pants.  Sanabria is not pictured because he took this photograph.



In the early evening of April 1, Dominguez and Torres were walking in the alley behind Villa Escondido.  This is the area on the other side of the metal gate and fence shown in the photograph.  Torres had a .45-caliber semiautomatic gun; Dominguez, a 9-millimeter.

Sanabria was standing inside the enclosure, next to the metal gate shown in the right center of the photo.  He was on the phone with his pregnant girlfriend, C.B., who was in a drug rehabilitation facility.  According to Coronado, Sanabria was telling C.B. how much he loved her and was

7

looking forward to being a father.  But C.B. testified she was upset and yelling at Sanabria:

> "Q:  During that conversation, you were—I mean, you were yelling at lot at [Sanabria], right?
>
> "A:  Yeah.
>
> "Q:  You were accusing him of using drugs?
>
> "A:  Yeah.
>
> "Q:  And he told you, [']No, I'm just drunk as fuck.[']
>
> "A:  Yes."

When the call ended, Luna was standing about five feet from Sanabria. Coronado was between the dumpster door and the corner of the dumpster wall.  Nava was near the end of the alcove.  Garcia was out of the enclosure, at the corner of the building.  At trial, Coronado placed initials where he claimed each person was standing.  We have superimposed names on those initials and indicated north/south for clarity:



8

Gunfire erupted about five minutes after Sanabria's call with C.B. ended. What happened immediately before the gunfire was hotly disputed.

C. *The People's Theory of Premeditated Murder*

The People's theory was that Dominguez and Torres planned and executed an ambush of rival Eastside gang members. The alleged motive was an all too familiar one in these cases: By killing rival gang members, Dominguez and Torres would gain status and respect within RTS.

To support that theory, the People presented evidence that Sanabria and the others (except Garcia) were unarmed and merely having a party. Nearby residents testified they heard no shouting or yelling before the gunfire. Coronado, who was granted immunity in exchange for truthful testimony, denied that the group was boisterous or violent. He told police he caught a glimpse of a gunman positioned over the top of the fence, and that the pedestrian gate was closed immediately before the shooting. He also testified that the shooters said nothing before firing, and he had never seen Dominguez or Torres before.[7]

In just 3.7 seconds, Dominguez and Torres fired 21 bullets.[8] This was significantly faster than would ordinarily be expected to aim and shoot. Sanabria was shot nine times. He also sustained "penetrating injuries" from shards of metal fence and/or gate that had been struck by bullets. Luna was shot in the leg. Coronado, Nava, and Garcia were unharmed.

---

[7] Coronado was impeached with his preliminary hearing testimony, where he stated that immediately before the gunfire, Sanabria opened the gate to greet in a friendly manner two men passing by.

[8] Coincidentally, a nearby resident was livestreaming on social media when the shooting started. Police counted and timed the gunshots from the recording.

9

D. *The Defense Case*

Torres testified that in the past he had been assaulted by gang members, including two occasions at gunpoint. In 2017, he learned that Eastside was trying to recruit RTS and did not want any part of it. Torres's RTS friends had recently been assaulted by Eastside, and he was "scared."

Torres stated that before the shooting, he and Dominguez had been drinking beer and smoking marijuana most of the afternoon. On the way to Dominguez's home for a meal, they took a shortcut—the alley behind Villa Escondido. Someone yelled, "Hey, come over here." Believing it might be someone they knew, Torres and Dominguez approached. Sanabria said, "Where the fuck you from? . . . This is Eastside." Lunging towards Torres, Sanabria reached for what appeared to be a weapon in his waistband. Fearing that Sanabria was going to kill him and "super scared," Torres drew his gun, closed his eyes and fired.

Dominguez testified similarly. He too was the past victim of gang violence, including an incident when at gunpoint someone asked, "Where are you from?" He carried a gun because Eastside was "jumping [his] friends and [he] needed to protect [him]self just in case."

Sanabria's blood tested positive for alcohol and PCP. He was under the influence of both substances at the time of the shooting. PCP reduces inhibitions and causes potentially aggressive behavior, feelings of invulnerability, and sometimes "very bizarre behavior." Alcohol can enhance these effects.

The defense theory was that Dominguez and Torres unwittingly walked into a firestorm of aggression: Sanabria, high on PCP, had just argued with his girlfriend, and called out to Dominguez and Torres to take it out on them. Dominguez testified that Sanabria propped the gate open with his left leg

10

and said, "Hey, who the fuck are you fools?  Like where the fuck you fools from, homie?  This is [Eastside]."  Sanabria started "pulling something" with a black handle from his waist  "[S]uper panicked[] [and]  super scared," Dominguez closed his eyes, "and then just started shooting random.  Everything happened in a matter of seconds.  It just caught me completely off guard."  Dominguez explained, "[M]y mind went blank."

DISCUSSION

A.  *The Court Erroneously Refused to Instruct on Voluntary Manslaughter Based on Heat-of-Passion.*

    1.  *Heat of Passion Voluntary Manslaughter:  General Principles*

Murder is the unlawful killing of a human with malice aforethought. (§ 187, subd. (a).)  A person who intentionally kills in a "sudden quarrel or heat of passion" (§ 192, subd. (a)) or in the unreasonable but good faith belief in having to act in self-defense (imperfect self-defense), lacks malice.  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  The resulting crime is voluntary manslaughter, a lesser included offense of murder.  (*Ibid.*)

Voluntary manslaughter based on heat of passion has both an objective and a subjective component.  (*Moye*, *supra*, 47 Cal.4th at p. 549.)  "The provocative conduct by the victim . . . must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  (*Id.* at p. 550.)  Subjectively, the defendant must have killed while under " 'the actual influence of a strong passion' induced by such provocation."  (*Ibid.*)  The passion aroused need not be anger or rage, but can be any intense emotion other than revenge. (*Breverman*, *supra*, 19 Cal.4th at p. 163.)  Thus, a defendant's "immediate fear and panic" can, in an appropriate case, provide evidence from which "a reasonable jury could infer that defendant was aroused to passion, and his

11

reason was thus obscured . . . ." (*Breverman*, *supra*, 19 Cal.4th at pp. 163–164.)

A trial court must instruct on lesser included offenses when there is substantial evidence that the defendant committed the lesser offense instead of the greater. (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792.) Here, in addition to jury instructions on (1) self-defense and (2) voluntary manslaughter based on imperfect self-defense (which the court gave), Defendants asked the court to also instruct with CALCRIM Nos. 570 and 603—voluntary manslaughter (and attempted voluntary manslaughter) based on heat of passion. The court denied these requests on the grounds there was insufficient evidence of both objective and subjective provocation, stating:

> "Here it cannot be said that reasonable people would become homicidally enraged when hearing 'Eastside' or 'where you from.' There was also no evidence that [D]efendant[s] exhibited anger, fury or rage when [they] fired [their] gun[s]. Further, the argument that [they] fired . . . after years of trauma is insufficient to merit an instruction."

2. *There was Substantial Evidence of Objective Provocation.*

"We review de novo a trial court's failure to instruct on a lesser included offense [citation], and in doing so we view the evidence in the light most favorable to the defendant[s]." (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1137.) In determining whether there is substantial evidence of objective provocation, a court is guided by two basic principles.

First, the relevant question is *not* whether an ordinary person would have become "homicidally enraged" by the provocative conduct. "Adopting a standard requiring such provocation that the ordinary person . . . would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the

12

defendant's state of mind, not on his particular act." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).)  The issue is whether the provocation would cause an emotion so intense that an ordinary person in the same or similar circumstances "would simply *react*, without reflection." (*Ibid.*)

Second, the defendant's reaction is measured against that of the ordinary reasonable person acting in the same or similar circumstances.  But the facts known to the defendant are part of the circumstances in which the reasonable person is deemed to be situated.  "To assess whether a belief was objectively reasonable, 'a jury must consider what "would appear to be necessary to a reasonable person in a similar situation and with similar knowledge." ' " (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014 (*Brady*).)  The jury "must assume ' "the point of view of a reasonable person in the position of defendant," ' taking into account ' "all the elements in the case which might be expected to operate on his mind." ' " (*Ibid.*)

At the same time, however, the standard always remains that of the ordinary reasonable person.  The defendant's conduct is not measured against that of, for example, the ordinary reasonable gang member or the ordinary reasonable person who "was intoxicated" or "suffered various mental deficiencies" or "psychological dysfunction due to traumatic experiences." (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)  The heat of passion " 'must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].' " (*Id.* at pp. 1252–1253.)

In sum, as this court stated in *Brady*, "the reasonable person standard takes into account a defendant's knowledge that may increase his or her ability to *accurately* predict impending violence." (*Brady*, *supra*, 22 Cal.App.5th at p. 1017.) While jurors cannot step into the shoes of a gang member, or a person with a mental disability, it is reasonable to expect them to understand how the facts and circumstances known to the defendant may affect the reasonableness of one's reaction to provocation. (See *People v. Horn* (2021) 63 Cal.App.5th 672, 685.)

Here, one such fact and circumstance is that when a gang member says, "Where you from?" to a perceived rival, violence is almost certain to follow. The gang expert testified:

> "Q: If an individual is not an Eastside gang member and they heard an Eastside gang member say [']where you from['] and they have reason to believe that the Eastside gang member associates them with a rival, that word—that phrase, 'where you from,' could have a significant connotation to that—the listener, correct?
>
> "A: Yes, sir.
>
> "Q: And it could be essentially telling them that they are about to be injured?
>
> "A: Yes.
>
> "Q: They're about to be assaulted or stabbed or shot or something like that?
>
> "A: Yes, sir." [¶] . . . [¶]
>
> "Q: *It's understood by individuals who have that question asked of them, that you could be killed?*
>
> "A: *You could, yes.*" (Italics added.)

Despite this evidence, the trial court and Attorney General contend that "Where you from?" could never objectively provoke heat of passion. We do not disagree that in the abstract, "where you from" is insufficient. But

14

words seldom have fixed meanings.  Meaning depends on the context and sense in which words are spoken.  (*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 38 (*PG&E*).)[9]  For example, "trunk" can mean the back of a car, the main stem of a tree, a sturdy box for holding clothes, a person's torso, and an elephant's nose.  The intended meaning is usually clear, however, by the context in which "trunk" is used.  When a traveler says, "put the luggage in the trunk," people don't look for an elephant.

In some other context, "Where the fuck you from" might be understood as an extremely rude insult.  But the facts and circumstances here—a confrontation between a criminal street gang and its perceived rivals—suggest that Sanabria used those words intending to mean, and was understood by the hearers (Defendants) to mean:  We're now going to hurt or kill you.  The gang expert testified, "Usually nothing good is going to come after that question."  The expert further explained:

> "Q:  You have testified that when gang members say, hey, where you from, there is no right answer to that, right?
>
> "A: Yeah.  Typically . . . when that question is asked, there's usually some form of violence coming your way." [¶] . . . [¶]
>
> "Q:  It's understood by individuals who have that question asked of them, that you could be killed?
>
> "A:  You could, yes."

---

[9]     " 'A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . .  [Citation].  The meaning of particular words or groups of words varies with the . . . [']verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . .  A word has no meaning apart from these factors.' "  (*PG&E, supra,* 69 Cal.2d at p. 38.)

Coupled with evidence that Sanabria lunged at Defendants while reaching for an apparent weapon in his waistband, these words—in this context, with this expert testimony—together constitute substantial evidence from which a jury could reasonably find objective provocation. A reasonable person in the same or similar circumstances would "act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570; see *Millbrook, supra,* 222 Cal.App.4th at pp. 1139–1140 [adequate provocation where the defendant testified "he was 'scared' and 'panicking' " when he shot the victim after the victim "clenched his fists and 'lunged' at [him]"]; see also *People v. Thomas* (2013) 218 Cal.App.4th 630, 645 (*Thomas*) [adequate provocation where victim lunged at defendant; defendant thought he was "going for the gun"]; *In re Hampton* (2020) 48 Cal.App.5th 463 (*Hampton*) [defendant testified that he fired when the victim lunged at him and did so without thinking because he was scared that he would be shot].)[10] (*Hampton,* at pp. 480–481.)

In ruling to the contrary, the trial court cited *People v. Avila* (2009) 46 Cal.4th 680, 706 for the proposition that a reasonable person would not "become homicidally enraged" when hearing, "This is Eastside." But as explained above, the relevant question is not whether the provocation is sufficient to cause homicidal rage. "[P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question

_____

10    The Attorney General seeks to distinguish *Thomas* and *Hampton* on the grounds that those cases involved a physical confrontation "where the victim lunged at the defendant and reached for a gun in the defendant's possession" and did not address "whether a gang challenge could be objectively sufficient for heat of passion." But as explained above, the evidence here goes well beyond a mere challenge and, like *Thomas* and *Hampton*, here there is evidence that Sanabria lunged at Defendants while apparently reaching for a gun or other weapon.

16

is whether the average person would *react* in a certain way:  with his reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949.)[11]  Moreover, in *Avila*, the claimed provocation was one word, "Carmelos," which the defendant did not even recognize, but assumed was a gang name.  (*Avila*, at p. 686.)  There was no other provocative conduct.  After the verbal confrontation in *Avila* dissipated, the defendant stabbed the victims.  (*Ibid*.)  In sharp contrast here, the Defendants testified that Sanabria lunged at them while reaching for an apparent weapon.

To support the trial court's ruling, the Attorney General primarily relies on *People v. Enraca* (2012) 53 Cal.4th 735 (*Enraca*), which he asserts stands for the proposition that "[a] victim's alleged gang challenge does not require an instruction on heat-of-passion manslaughter."  This argument fails for two reasons.  First, as just explained, the evidence of provocation here goes substantially beyond an insult and gang challenge.  Second, there was *no* evidence in *Enraca* that the defendant acted in the heat of passion.  Outnumbered nearly 20 to 1, a gang member (Gobert) said, " 'Fuck you, slobs' " to the defendant and his cohorts.  (*Id*. at p. 742.)  In response, the defendant *laughed* because Gobert was drunk and vastly outnumbered.  (*Ibid*.)  Later, when Gobert then lifted up his shirt as if he had a gun (objectively provocative conduct), the defendant "remained calm and tried to

---

[11]    Although the phrase "homicidally enraged" appears in *Avila*, no other Supreme Court case of which we are aware uses that term to describe adequate provocation.  Accordingly, we understand it to mean a provocation that would cause a reasonable person to become "so inflamed as to lose reason and judgment," which is how the Supreme Court has described adequate provocation in cases both before and after *Avila*.  (*Beltran*, *supra*, 56 Cal.4th at p. 949; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 (*Manriquez*); *People v. Gutierrez* (2009) 45 Cal.4th 789, 827; and *People v. Thomas* (2012) 53 Cal.4th 771, 813.)

exert a calming influence" on other gang members. (*Id.* at p. 760.) The defendant told police he drew his pistol "with the intention of stopping" a fight and intended to shoot in the air so that "everyone would just run." (*Ibid.*)

Thus, in *Enraca* there was initially no objective provocation because the start of the encounter was literally laughable. And in the face of subsequent objectively provocative conduct, the defendant admitted he remained calm. Read in light of its facts, we do not understand *Enraca* to create a "gang exception" to established principles governing heat-of-passion voluntary manslaughter.[12]

3. *There was Substantial Evidence of Subjective Provocation.*

To satisfy the subjective component, the defendant must have acted while under the actual influence of "a strong passion." (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1139.) The passion aroused "need not be anger or rage," but can also be any intense emotion except revenge. (*Ibid.*) The Attorney General concedes this includes fear. (*People v. Mitchell* (1939) 14 Cal.2d 237, 252.)

Dominguez testified that after Sanabria said, "This is Eastside" and reached for a black-handled object in his waistband, he "reacted" while "super panicked," and "super scared." He claims that his mind "went blank," he closed his eyes, and could not stop shooting until his gun was empty. Torres similarly testified that he was "scared," "super scared" and "just started

---

12    The Attorney General's reliance on another Supreme Court case, *Manriquez*, *supra*, 37 Cal.4th 547, is misplaced for the same reason. There, the only evidence of provocation was the victim called the defendant a " 'mother fucker' " and taunted him to use a weapon if he had one. (*Id.* at p. 586.) The Supreme Court held such conduct was "plainly . . . insufficient to cause an average person to become so inflamed as to lose reason and judgment." (*Ibid.*) Nothing in our analysis is inconsistent.

18

firing" with his eyes closed. Viewing the evidence in the light most favorable to Defendants, as we must on this issue, their testimony is plainly sufficient to support a finding of subjective provocation. The rapid fire—21 bullets in 3.7 seconds—is consistent with a panic shooting.

In ruling there was insufficient evidence of subjective provocation, the trial court stated, "To satisfy the subjective component, there must be some showing that defendant exhibited anger, fury or rage so that he actually killed under the heat of passion." The court erred because *any* intense emotion (except revenge) may suffice—including fear and panic.

For example, in *Thomas*, *supra*, 218 Cal.App.4th 630, a dispute over parking escalated into a shooting. Thomas, the defendant in that case, testified that he was "afraid" and "nervous" and "just wasn't thinking clearly" when Navarro, the victim, lunged at him while reaching for a gun. (*Id.* at pp. 639–640.) Thomas testified that he was afraid of being injured or killed, and felt he had no choice but to shoot. (*Id.* at p. 640.) The Court of Appeal held the trial court prejudicially erred in denying Thomas's request to instruct the jury on heat-of-passion voluntary manslaughter. The court explained:

> "Thomas says Navarro lunged at him, and he pulled the trigger. Thomas thought Navarro was going for the gun, and said he did not intend to fire. He fired because he was afraid, nervous and not thinking clearly. Although these facts may fit more precisely with a homicide mitigated by imperfect self-defense, we cannot rule out that they may also show that Thomas was guilty only of voluntary manslaughter because when he shot Navarro his passion was aroused and his reason was obscured due to a sudden quarrel." (*Id.* at p. 645.)

In seeking to uphold the trial court's ruling, the Attorney General contends that Defendants' fear ("if it existed") could have supported

19

instructions on self-defense and imperfect self-defense (which the court gave), but not voluntary manslaughter based on heat of passion. We disagree because these theories are not mutually exclusive. Where, as here, there is evidence that the victim was the first to attack the defendant, instructions on heat of passion may be required in addition to those on reasonable and/or imperfect self-defense, depending on the particular facts. In *People v. St. Martin* (1970) 1 Cal.3d 524, the Supreme Court observed: " 'In a prosecution for murder the presence of sufficient provocation or heat of passion negates the existence of the requisite malice aforethought. [Citation.] *In the usual case, this instruction supplements the self-defense instruction.* Thus, in a prosecution for murder, even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute provocation, which would preclude a finding of malice aforethought and reduce the crime to manslaughter.' " (*Id.* at pp. 530–531, italics added.)

It is correct, as the Attorney General argues, that imperfect self-defense and voluntary manslaughter based on heat of passion are closely related. The victim's conduct that justifies the use of some force in self-defense will often be the reasonable provocation that causes a defendant to lose self-control in the heat of passion. But the theories serve different purposes and involve different analyses. Evidence may support one but not the other.

For example, a defendant's cool calculation to use deadly force in the face of a threat will defeat a heat-of-passion voluntary manslaughter theory. In fact, as we just explained, this is the fact pattern in *Enraca*, *supra*, 53 Cal.4th at page 760. But the same evidence may permit a theory of imperfect self-defense (excessive force in self-defense). Similarly, a reasonable

20

opportunity to retreat may defeat a claim of perfect or imperfect self-defense because "the opportunity to retreat means that no use of force was reasonable." (*Commonwealth v. Glover* (Mass. 2011) 459 Mass. 836, 842 [948 N.E.2d 415, 421].) At the same time "the victim's conduct that caused the defendant to believe he was in imminent danger may be sufficient to support a theory of reasonable provocation." (*Ibid.*)

If there is substantial evidence that the defendant killed with a good faith but unreasonable belief in the need for self-defense, *and also* that the defendant killed because his reason was obscured by passion in response to the victim's objectively provocative conduct, the trial court should instruct on voluntary manslaughter under *both* unreasonable self-defense and heat of passion theories. For example, in *Breverman, supra*, 19 Cal.4th 142, instructions on these two theories were required based on evidence that a group of armed men were in front of the defendant's home bashing his car. In response, the defendant, fearing the attackers would enter his home and kill him, shot through a windowpane and then, after going outside, fatally shot one of the men. (*Id.* at pp. 150–151.) Similarly, in *People v. Barton* (1995) 12 Cal.4th 186, 202, the Supreme Court held that a trial court was required to instruct on both imperfect self-defense and heat of passion theories of voluntary manslaughter where there was substantial evidence that defendant shot the victim during a heated argument and also in the unreasonable-but-good-faith belief in self-defense.

*Millbrook, supra*, 222 Cal.App.4th 1122 is particularly instructive because the Court of Appeal held the evidence required instructions on self-defense, imperfect self-defense, and heat of passion. The appellate court stated:

21

"[W]e first observe that there is nothing in the jury's verdict that is inconsistent with the need for a heat-of-passion instruction. If the jury had returned a verdict on the allegation that [defendant's] attempted murder . . . was willful, premeditated, and deliberate, the finding would have been 'manifestly inconsistent with having acted under the heat of passion.' [Citation.] But the jury was unable to return such a verdict. And although the jury must have found that [the defendant] intended to kill since such a finding is a prerequisite for a conviction of attempted murder, the finding does not rule out the possibility that [he] acted upon a sudden quarrel or in the heat of passion. [Citation.] This possibility was similarly not ruled out by the jury's rejection of the two self-defense theories upon which it was instructed—that [defendant] was not guilty of attempted murder because he acted in reasonable self-defense and, in the alternative, that [he] was guilty only of attempted voluntary manslaughter because he acted in imperfect self-defense. Indeed, ' "[i]n the usual case," ' a heat-of-passion instruction ' "supplements the self-defense instruction." ' " (*Millbrook, supra*, 222 Cal.App.4th at p. 1138.)

Here, even if the jury did not believe that Defendants either reasonably or unreasonably thought deadly force was necessary—as jurors may have concluded in rejecting these theories—they could nevertheless have found that Defendants fired in the heat of passion. (See *Hampton, supra*, 48 Cal.App.5th at pp. 480–481 [self-defense, imperfect self-defense, and heat of passion instructions required where defendant testified the victim attempted to rob him and, afraid he would be shot, defendant grabbed the gun and shot "without conscious thought"].) Accordingly, the court should have given the requested instruction.

In a related argument, citing *People v. Wickersham* (1982) 32 Cal.3d 307 (*Wickersham*), the Attorney General contends the trial court correctly refused to instruct on heat of passion because the "same facts" supported a

finding of reasonable self-defense. But we read *Wickersham* more narrowly.[13] In *Wickersham*, the only evidence of provocation was that the victim grabbed a nearby gun. (*Wickersham,* at p. 327.) The court held that even if that was "provocation," it would also necessarily "give rise to a finding of reasonable self-defense." (*Id.* at p. 328.) Under those circumstances, the court held that a heat-of-passion instruction was not appropriate. (*Id.* at pp. 327–328.)

*Wickersham*'s point, we believe, is that a jury cannot avoid acquitting a defendant based on self-defense by finding that the victim's act that *justified* a self-defense killing also provoked a heat-of-passion voluntary manslaughter. Otherwise, the jury could convict a defendant of voluntary manslaughter even when he or she committed a justified homicide and should have been acquitted. Thus, *Wickersham* holds that when the *only* "provocation" is one that would support a claim of self-defense, the jury need not be instructed on heat-of-passion manslaughter. *Wickersham* does not apply here because Sanabria's reaching for a weapon was only part of the provocation.

4. *The Court's Refusal to Instruct on Heat of Passion Was Prejudicial.*

The parties disagree on the applicable standard for assessing prejudice—Defendants contend the *Chapman*[14] standard applies, while the

---

13    *Wickersham* has been cited with "negative treatment" in 420 subsequent appellate opinions—too numerous to list here.

14    *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].

Attorney General advocates for *Watson*.[15]  As we explain, Defendants have the better argument.

In *Thomas, supra*, 218 Cal.App.4th 630, the Court of Appeal addressed this issue and concluded *Chapman* applies.  The court's rationale was straightforward:  because malice is an element of murder and heat-of-passion negates malice, when heat of passion is put in issue the federal due process clause requires the prosecution to prove the absence of provocation beyond a reasonable doubt.  The *Thomas* court explained, "Thus, in California, when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking." (*Thomas*, at p. 643.)  Accordingly, *Thomas* held that because " '[j]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution,' " the "[f]ailure to instruct the jury on heat of passion to negate malice is federal constitutional error requiring analysis for prejudice under *Chapman*." (*Thomas*, at p. 644.)

We find *Thomas*'s reasoning persuasive.[16]  And the failure to instruct on heat of passion voluntary manslaughter was certainly not harmless

---

[15]  *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal required only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error"].

[16]  We also note that the Attorney General's discussion of this issue borders on a concession that *Chapman* applies.  Without discussing *Thomas, supra*, 218 Cal.App.4th 630, and with no other analysis or argument, the Attorney General simply asserts as if it were self-evident, "The court should apply *Watson*."

beyond a reasonable doubt.  Notably, the jury acquitted Defendants on first degree premeditated murder and found "not true" that the attempted murders were "willful, deliberate and premeditated."  The jury rejected the People's theory of a planned ambush, and seemingly accepted that Defendants were provoked in some degree or manner.

Moreover, although the jury rejected the two self-defense theories upon which it was instructed, heat-of-passion voluntary manslaughter is distinct. For example, a finding that Defendants did not act in self-defense because they could have simply run away from the encounter (making the use of any force unreasonable) would not have precluded a properly instructed jury from also concluding that Defendants fired in subjective fear and panic caused by objectively adequate provocation.  Thus, this case is unlike *Moye*, *supra*, 47 Cal.4th 537, where in rejecting the self-defense argument, the jury necessarily rejected the only evidence that would have supported a heat-of-passion instruction.  (See discussion in *Millbrook*, *supra*, 222 Cal.App.4th at p. 1148.)

In assessing the prejudicial effect of the failure to instruct on heat of passion voluntary manslaughter, it is also significant that the court instructed the jury with CALCRIM No. 522 on provocation.  That instruction states, "Provocation may reduce the murder from first degree to second degree" and "If you conclude that the defendants committed murder but were provoked, consider the provocation in deciding whether the crime was first or second degree murder."

"[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree . . . ."  (*People v. Jones* (2014) 233 Cal.App.4th 995, 1000.)  Thus, we know that by giving this instruction, the trial court determined there was substantial evidence that Defendants were

25

subjectively provoked. By acquitting on first degree and convicting on second degree murder, the jury apparently found that Defendants were subjectively provoked. The problem is the jury was not given the option of also finding objectively adequate provocation to result in voluntary manslaughter rather than second degree murder.

Based on the jury's rejection of both self-defense theories, it is unclear how much of Defendants' testimony jurors found credible. Dominguez and Torres may well have been lying. When they thought no one was listening, they talked about getting their stories straight. But especially because the jury rejected the prosecutor's theory of a premediated ambush killing, we cannot conclude that the failure to instruct on voluntary manslaughter based on heat of passion was harmless beyond a reasonable doubt.

B. *Instruction on the "Kill Zone" Theory*

To prove attempted murder, the prosecution must establish "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be established independently as to each alleged victim. (*People v. Windfield* (2021) 59 Cal.App.5th 496, 514 (*Windfield*).)

The nature of the attack directed at a primary victim may support an inference that the defendant intended to ensure he killed that person by killing everyone in the vicinity. The textbook example is where the defendant places a bomb on a commercial airplane, intending to kill one primary target by a method sure to kill all on board. (*People v. Bland* (2002) 28 Cal.4th 313, 329–330.) Under this "kill zone" theory, " 'a shooter may be convicted of multiple counts of attempted murder . . . where the evidence

26

establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim.' " (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

At the People's request, the court instructed the jury with former CALCRIM No. 600, which at the time of trial stated:

> "A person may intend to kill a specific victim or victims, and at the same time, intend to kill everyone in a particular zone of harm or kill zone. In order to convict a defendant of the attempted murder of Joseph Luna, Juan Coronado, or Alberto Nava, the People must prove that the defendant not only intended to kill Angel Sanabria, but also either [*sic*] intended to kill everyone within the kill zone."

1. *The Court's Kill Zone Instruction Was Prejudicially Erroneous.*

During the pendency of these appeals, the Supreme Court reexamined the kill zone theory in *Canizales* with the goal of "more clearly defining" it. (*Canizales*, *supra*, 7 Cal.4th at p. 606.) That case arose out of a gang-related shooting at a neighborhood block party. Shots were fired from a nine-millimeter gun from between 100 and 160 feet away, killing a bystander but missing the intended targets, two men whom Canizales had argued with earlier in the day. (*Id.* at p. 611.) At Canizales's trial for the bystander's murder and attempted murders of the two men, the court instructed the jury on the kill zone theory. (*Id.* at pp. 600–601.) Canizales was found guilty of murder and two counts of attempted murder. (*Id.* at pp. 597, 601.)

On review, the Supreme Court first discussed how "past cases reveal there is a substantial potential that the kill zone theory may be improperly applied." (*Canizales*, *supra*, 7 Cal.5th at p. 597.) The court held that "the kill zone theory for establishing the specific intent to kill required for a conviction of attempted murder may be properly applied only when a jury concludes:

27

(1) the circumstances of the defendant's attack on a primary target are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death"; and "(2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Id.* at p. 607.) *Canizales* also identified factors a jury should consider in making these determinations:

> "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

Turning to the facts before it, the Supreme Court concluded there was insufficient evidence to warrant giving the kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 609–611.) The shooter was between 100 and 160 feet away from the primary target, and the shots were fired at an outdoor block party on a "wide city street" with easy escape routes. (*Id.* at pp. 599, 611.) The primary target fled down the street in the opposite direction after the first shot. (*Id.* at p. 611.) The court concluded that "the evidence . . . was not sufficient to support a reasonable inference that [the] defendants intended to create a zone of fatal harm around a primary target." (*Ibid.*) It further stated that former CALCRIM No. 600—the same instruction given by the trial court here—"should be revised to better describe the contours and limits

28

of the kill zone theory as we have laid them out here." (*Canizales*, at p. 609.)[17]

Defendants in this case contend—and the Attorney General agrees—that the attempted murder convictions should be reversed because not having the benefit of *Canizales*, the trial court gave a legally inadequate kill zone instruction. We accept the concession. The instruction given, former CALCRIM No. 600, did not explain the People's burden to prove that the "only" reasonable conclusion from Defendants' use of lethal force is that they intended to create a kill zone. Nor did the instruction direct the jury's attention to the factors *Canizales* identifies as being particularly relevant in reaching that conclusion.

### 2. *Defendants May Be Retried on a Kill Zone Theory with Proper Instructions.*

We next turn to whether the attempted murder convictions are supported by substantial evidence. Defendants raise this issue because the People are permitted to retry them on these charges only if sufficient evidence was presented in the first trial to support them. (See *Millbrook*, *supra*, 222 Cal.App.4th at p. 1149.)

We conclude that sufficient evidence was presented that would support the attempted murder convictions. "The very fact that [Defendants] created a hail of bullets at close range to two individuals" who were within a few feet of each other as well as Sanabria (the target) "is the very definition of creating a kill zone." (*Windfield*, *supra*, 59 Cal.App.5th at p. 518.) Moreover, Defendants fired the 21 shots into a small space enclosed on three sides. And they fired so rapidly that the victims had little chance of escape. In closing

---

17    In response to *Canizales,* CALCRIM No. 600 has now been revised.

argument, the prosecutor focused the jury's attention on these very factors, explaining:

> "They were in what was a kill box. A kill zone. And it was a small place. It was a confined space. I believe the testimony was like seven feet by fourteen feet. And if that wasn't enough, it was crowded by that sofa which made it even more narrow. It was dense with men. And you got to see the picture of that.

> "Mr. Coronado's and Mr. Sanabria's picture itself shows how crowded it was in that small space. And it was confined on all sides but one. It was a guaranteed hit for these two. They didn't have to aim[;] they could point and shoot. They could use rapid fire and point and shoot to kill them all, and that's what they did."

In urging the evidence is insufficient, Defendants primarily rely on *People v. Cardenas* (2020) 53 Cal.App.5th 102, which they contend "involved remarkably similar facts." We disagree; the case is factually quite different. In *Cardenas*, the shooting occurred in two distinct phases, which the court analyzed separately. (*Id.* at p. 114.) During the first phase, the target (Armando) was standing 15 feet directly in front of the shooter, Cardenas. But "[n]o one else was standing next to Armando when those shots were fired." (*Ibid.*) A bystander, Juan, was struck by a bullet, but he was at least one car length behind Armando, and the manner in which Cardenas fired his gun did not show he was attempting to create a zone of fatal harm around Armando. Rather, "he pointed the gun in the direction of the target, Armando, and fired two shots from close range." (*Ibid.*) Accordingly, the Court of Appeal determined there was insufficient evidence from which a jury could conclude that even a reasonable inference, "let alone the *only* reasonable inference was that during the first phase of the attack, Cardenas intended to create a kill zone in order to kill Armando." (*Ibid.*)

30

In the second phase, Cardenas retreated. This took him farther away from Armando's group, and resulted in parked vehicles obstructing his line of fire. One shell casing was found 40 feet away from where the group was seeking cover by a vehicle. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 115.) The appellate court concluded there were "numerous alternative reasonable inferences, such as that Cardenas's intention in continuing to fire while retreating was just to facilitate his escape." (*Ibid*.)

The evidence here is materially different. Indeed, *Canizales* itself distinguished cases like this one involving multiple defendants who fire a " ' "flurry of bullets" ' " in "close proximity to the area surrounding their intended target."[18] (*Canizales*, *supra*, 7 Cal.5th at pp. 610–611.) Because we conclude the evidence was sufficient to support a finding beyond a reasonable doubt that defendants intended to kill Luna and Coronado inside a "kill zone," they may be retried on those two counts of attempted murder. (See *People v. Towler* (1982) 31 Cal.3d 105, 118.) If they are retried, it will be for the jury, properly instructed after it hears all the relevant facts, to decide in the first instance which inferences are reasonable and which are not.

---

[18] The evidence supporting a kill zone instruction here stands in stark contrast to the facts in *Canizales*—where the shooter fired from between 100 to 160 feet away on a city street with open escape routes.

## DISPOSITION

Except with respect to counts upon which the jury returned a verdict of acquittal, the judgments are reversed and the matters remanded for a new trial.

DATO, J.

WE CONCUR:

HALLER, Acting P. J.

DO, J.