Filed 9/10/25  P. v. Ford CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

---

| | |
|---|---|
| THE PEOPLE, | C099593 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CF00916) |
| v. | |
| KIPP RAY FORD, | |
| Defendant and Appellant. | |

Defendant Kipp Ray Ford appeals from his convictions for using an incorrect contractor's license number with intent to defraud, obtaining money, labor, or property exceeding $950 in value by false pretenses, contracting without a license in a disaster zone, offering a false document, and failure to appear.  He claims reversal is required because his trial counsel labored under an actual conflict of interest that adversely affected her performance, depriving defendant of his federal Sixth Amendment right to effective assistance of counsel.  The claim stems from trial counsel's prosecution by the same entity prosecuting defendant, as well as the activities of counsel's boyfriend, who was alleged to have threatened defendant and potentially involved himself in defendant's

1

representation. In the alternative, defendant contends the trial court erred by failing to adequately inquire into counsel's conflict of interest. Defendant fails to demonstrate that his counsel's conflict of interest adversely affected her performance or that he was prejudiced as a result, and therefore we will affirm the judgment.

## FACTS AND PROCEEDINGS

Because the underlying facts of the case are of marginal relevance, we summarize them briefly.

*Defendant's Dealings with Nor Cal Development*

After the Camp Fire burned more than 14,000 structures in Paradise in 2018, licensed general contractor Frank Lewis started a partnership called Nor Cal Development (Nor Cal) to rebuild homes in the area. In October 2019, Lewis entered into two contracts with defendant in which defendant agreed to perform foundation and framing work at two jobsites in exchange for more than $34,000 combined, including labor and materials.[1] Lewis sent defendant's company two checks totaling more than $17,000. Defendant's name was listed on the contracts with a contractor's license number and signature. A third contract was drawn up between Nor Cal and defendant for work to be done at a third jobsite, but Lewis did not sign the contract, as by that time he had realized that defendant had not completed any work at the other sites. Lewis explained that defendant had dug the footings at one jobsite but had incorrectly set up the form boards, requiring Nor Cal to redo the work.

---

[1] Defendant testified that he learned of the Camp Fire while serving a 10-year prison sentence after being convicted of forgery, failure to appear, vehicle theft, passing false checks, and stalking. Following his release from prison, defendant met Lewis, who showed him plans for the houses that were being built and informed him that he needed someone to pour concrete at the job sites.

Defendant had provided Lewis's bookkeeper with the contractor's license and bond numbers for the contracts, but she was unable to verify those numbers with the California State Licensing Board.[2]  Despite promising to resolve the issue, defendant never provided updated information.  Lewis confronted defendant with the problems with his work and contractor's license number, and although defendant agreed to return the money to Lewis that he had been paid, he never did.

Defendant ordered materials to be delivered to one of the jobsites, but did not pay for them.  After Lewis fired defendant, defendant did not leave any construction materials behind that the company could use.

In January 2020, the Butte County District Attorney charged defendant with using an incorrect contractor's license number with intent to defraud (Bus. & Prof. Code, § 7027.3; count 01), obtaining money, labor, or property exceeding $950 in value by false pretenses (Pen. Code, § 532, subd. (a); count 02), and contracting without a license in a disaster zone (Bus. & Prof. Code, § 7028.16; count 03).

*Defendant's Offering a False Document and Failure to Appear*

On March 16, 2022, defendant's attorney at the time, Michael Rooney, presented the court with a declaration signed by defendant, under penalty of perjury, explaining that he was unable to appear in court on the charges at issue here because he was employed by Colorado-Rock LLC, and his supervisor informed him that he would lose his job if he did not show up for work on a large contract with the Bureau of Land Management. Defendant's bookkeeper, Sarah Curtis, later explained that Colorado-Rock did not have any such contracts at that time, and defendant owned the company and did not have a supervisor or mandatory work shifts.

---

[2]  It was later determined that defendant had never applied for a contractor's license in California.

3

Defendant testified at trial that he appeared in court at his next court date, on March 30, but during a break in proceedings he learned of a problem with the sale of his family's ranch in Texas.[3]  He added that he texted Rooney that there was an emergency and that he needed to leave right away, and then he left.

In April, defendant was arrested at Curtis's house in Utah; law enforcement found him hiding in a closet in the garage.

In July, the People filed a consolidated information adding to the three contracting charges two additional charges for procuring and offering a false or forged instrument (Pen. Code, § 115, subd. (a); count 4), and failure to appear (*id.*, § 1320, subd. (b); count 5), with the allegation as to each additional count that defendant committed the crime while on bail or released on his own recognizance (*id.*, § 12022.1).

*Trial Counsel's Criminal Charges and Possible Threats by Counsel's Boyfriend*

Defendant retained attorney Stephana Femino to represent him on or around July 6, 2022.  On August 19, the Butte County District Attorney charged Femino with criminal charges unrelated to the charges defendant was then facing, including felony accessory after the fact (Pen. Code, § 32); misdemeanor possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)); and misdemeanor unlawful possession of a smoking device or drug paraphernalia (*id.*, § 11364, subd. (a)).  The accessory charge related to the allegation that Femino had harbored her boyfriend, Adam Ashford.

Defendant's jury trial began on October 3, 2022.  On October 6, the second day of trial, the prosecutor requested to place a matter on the record.  With the trial court's permission, Lieutenant Barkley explained that he had been informed by "our chief investigator" that defendant may have been threatened by Ashford, who was then housed

---

[3]  At that court appearance defendant learned that he had been charged with procuring and offering a false or forged document (Pen. Code, § 115, subd. (a)) related to the March 16, 2022, declaration.

in jail alongside defendant. Barkley added that he "[did not] know anything," the threat might have occurred two weeks earlier, and "it sounds like it's resolved."

Femino commented, "There was no issue." The trial court replied that it had not yet asked for her to address Barkley's information. The prosecutor requested that the court inquire with defendant whether his ability to freely choose his attorney had been impaired and suggested that the court question defendant outside Femino's presence. The prosecutor added that he did not know the truth of the allegations, but was only relaying what he had just learned. Defendant commented, "I'm not going to speak without my counsel present, Your Honor."

Femino indicated that defendant was welcome to speak about the issue, provided he felt comfortable doing so. The court asked defendant whether he felt threatened by Ashford; defendant responded that he did not feel threatened and had no issues in the housing unit, although he was concerned about what problems the investigator might have created by talking to other people housed in the unit. The court determined there was no need to address the issue further if defendant did not feel threatened.

For context and to make a record, the prosecutor explained that Ashford and Femino had been in a romantic relationship (although he did not know if the relationship was continuing), and Ashford was involved in a pending criminal case in which Femino was also charged. Femino stated her belief that the prosecutor had raised the issue "to threaten [defendant] into trying not to continue with [her]," and to harass her. The court brought the jury back into the courtroom.

The following day, Femino indicated that after defendant returned to jail following court the prior day, he was pulled from his cell and questioned by staff about possible threats made by Ashford. Femino indicated that the questioning "could potentially have caused [defendant] issues," and she requested that the prosecution provide its basis for believing that a threat had occurred. She argued it was inappropriate and negligent for the prosecutor to put on the record that Ashford had possibly threatened defendant

5

without adequate support for the allegation.  She requested that the discussion about the alleged threats be stricken from the record, or the court order the prosecution to provide information about the origin of the report.  The court declined Femino's request because defendant had stated that he did not feel threatened, and therefore the issue was moot.

*Defendant's Allegations in the Probation Report*

On October 14, 2022, a jury found defendant guilty as charged.

The probation report filed with the trial court in advance of sentencing reflected defendant's statements to the probation officer regarding threats by Ashford.  Defendant said that Ashford had " 'pushed up on [him] to pay [Femino] some more.' "  He added that Ashford had attempted to get him to deposit money into Ashford's inmate account, and Ashford had told other inmates about defendant's history and family and that defendant was a confidential informant.  He stated that he did not trust Femino because she did not file documents as promised, did not file " 'the right paperwork,' " and incorrectly claimed that his case would not go to trial.  He added that he had given Ashford paperwork that Ashford then threw away, and Femino had told Ashford about the content of his phone calls with his family.  Defendant stated that he feared for his safety while incarcerated.

On November 16, the date set for sentencing, Femino indicated that she was not comfortable proceeding with sentencing until defendant could resolve the issues he had raised in the probation report.  Defendant explained to the trial court that in the three weeks since his trial, he had asked his family to contact the district attorney's office to set up a meeting.  He asserted that he had been threatened during trial, although he "wasn't aware of what exactly was said at that time, I was just aware that something was said." He had been told by other inmates that he and his family had been threatened, and there had been threats regarding the outcome of his case.  He added that he was finally able to voice his concerns because he "finally got [his] point across to jail staff, and they moved [him] out of that situation."

6

The trial court asked defendant how that related to Femino. Defendant responded that Ashford was Femino's boyfriend, and Ashford had threatened that defendant and his family could be harmed if he did not pay Femino. He added that Femino had offered to file motions on his behalf, but Ashford had given him the motions at night in his cell with dollar figures written on them. Defendant stated that he did not feel safe contacting anyone about the situation because Femino, as his attorney, could monitor his jail calls. He speculated that other inmates may have been paid to harm him if he did not make his final payment to Femino, which he refused to make because he was using those funds as leverage to protect himself. He requested that the court provide him with a different attorney.

Femino declared a conflict and asked to be relieved as counsel. She asserted that she met with defendant to review the probation report, and contacted the prosecutor to inform him that defendant was requesting a private meeting, although she did not know what the meeting was about. The prosecutor had told Femino that he was not interested in meeting with defendant. She added that she hoped defendant's claims were investigated, because they were baseless. After a recess, the court relieved Femino as defendant's counsel.

On December 15, Femino was ordered inactive by the California State Bar due to her pending felony charge.

*Sentence and Appeal*

On August 23, 2023, the trial court sentenced defendant to three years in prison on count 1 and eight months consecutive on each of counts 2 through 5, plus two years for the section 12022.1 enhancement in count 5, for a total sentence of seven years eight months.

Defendant timely filed notice of appeal. The case was fully briefed in April 2025 and was assigned to the current panel the following month.

7

## DISCUSSION

### I

*Conflict of Interest*

Defendant contends reversal is required because Femino labored under an actual conflict of interest that adversely affected her performance. We disagree that reversal is warranted, as we next explain.

A. *Legal Background*

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.] 'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) "If a conflict of interest impedes defense counsel from asserting his client's contentions without fear of consequences to himself or herself, the integrity of the adversary system is cast into doubt because counsel cannot 'play[] the role necessary to ensure that the trial is fair.' " (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1137-1138 (*Harris*), quoting *Strickland v. Washington* (1984) 466 U.S. 668, 685 (*Strickland*).)

"[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under *Strickland*, *supra*, 466 U.S. at page 694 generally require a defendant to show (1) counsel's deficient

8

performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. [Citation.] In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' " (*Doolin, supra*, 45 Cal.4th at pp. 417-418.)

"[Our Supreme Court] has suggested that a determination of whether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " (*Doolin, supra*, 45 Cal.4th at p. 418.)

Except in a concurrent representation case where an actual conflict arises from the dual representation (not applicable here), there is no presumption of prejudice in the posttrial conflict of interest context. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309; *Doolin, supra*, 45 Cal.4th at p. 420 [other than in concurrent representation cases, the supreme court "ha[s] never eliminated our general requirement that a defendant demonstrate outcome-determinative prejudice from a violation of his state constitutional right to conflict-free counsel in order to obtain relief"]; *People v. Ramirez* (2006) 39

Cal.4th 398, 427-428.)  Where there is no presumption of prejudice, "a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different." (*Gonzales and Soliz*, at pp. 309-310; see *Doolin*, at p. 421.)  " ' " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.]  . . . [W]e have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 86.)

Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact we review independently.  (*People v. Jones* (2010) 186 Cal.App.4th 216, 235-236; *Strickland*, *supra*, 466 U.S. at p. 698.)

B.  Harris *and* Almanza

In support of his argument that Femino labored under an actual conflict of interest that adversely affected her performance, defendant relies on *Harris*, *supra*, 225 Cal.App.4th at page 1129 and *People v. Almanza* (2015) 233 Cal.App.4th 990.  In *Harris*, attorney Diaz represented the defendant at the preliminary hearing.  Diaz was facing felony charges brought by the same agency that had brought the charges against the defendant, and he had been arrested by the same officer who had arrested the defendant.  Additionally, the arresting officer was the sole prosecution witness at the defendant's preliminary hearing, and was a potential witness in the proceedings against Diaz.

The appellate court concluded that Diaz had an actual, not merely potential, conflict of interest.  (*Harris*, *supra*, 225 Cal.App.4th at p. 1138.)  The court noted that a conflict of interest existed when the attorney owed a duty to someone whose interests in the proceeding are adverse to those of his client, and observed that the "someone" in that

10

case was Diaz himself. (*Ibid.*) Diaz's pending charges, and the fact that he had been arrested by the officer who had arrested the defendant, "could reasonably be thought to exert a conscious or unconscious influence on Diaz's own judgment and conduct in representing [the defendant's] interests." (*Id.* at p. 1139.) The court observed: "As a criminal defendant, it can reasonably be assumed that Diaz had an interest in maintaining a cordial and cooperative (if not even subservient) relationship with the district attorney's office—a relationship that might be beneficial to Diaz in achieving a favorable disposition of the charges facing him. But [the defendant] had no interest in achieving a beneficial disposition of the charges against Diaz. And Diaz's duties with respect to the charges simultaneously facing [the defendant] almost certainly called for a different— perhaps somewhat less conciliatory and more adversarial—relationship with the prosecutor's office, were it not for his own contrary self-interest." (*Ibid.*) The court added, "The potentially conflicting influences on Diaz's relationship with the prosecuting entity, and with [the arresting officer], give rise to a genuine and understandable uncertainty whether Diaz could be depended upon to be wholly uninfluenced and unaffected by his own interests while defending [the defendant's]." (*Id.* at p. 1140.)

In granting the defendant's petition for writ of prohibition and ordering the information dismissed, the court found that Diaz's conflict of interest at the defendant's preliminary hearing required dismissal of the information *without* an affirmative showing of prejudice. (*Harris*, *supra*, 225 Cal.App.4th at p. 1145.) In doing so, the court relied on *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, which held that "[w]hen the issue is raised in the trial court before the defendant's conviction, a challenge to counsel's conflict of interest does not depend on a showing that conflict-free counsel would have obtained a better result." (*Harris*, at p. 1146.) The Supreme Court has cautioned that the "decision in *Pompa-Ortiz* must not be read overbroadly." (*People v. Standish* (2006) 38 Cal.4th 858, 885.)

11

*Harris* does not establish a rule that an actual conflict of interest exists, or that an attorney's deficient performance and prejudice are presumed, at any time an attorney representing a criminal defendant is also the subject of charges filed by the same prosecuting agency. Instead, *Harris* concluded more narrowly that a conflict of interest was established by both the prosecution of Diaz on multiple felony charges and the defendant by the same district attorney, *and* the fact that the same officer arrested both Diaz and the defendant. (*Harris*, *supra*, 225 Cal.App.4th at p. 1139.) This case does not involve the potential for overlapping witnesses. Additionally, the conflict of interest in *Harris* came to light when the defendant brought a *pretrial* motion to dismiss the information after the preliminary hearing, not after a guilty verdict at trial, as did the allegation of conflict here.

In *People v. Almanza*, *supra*, 233 Cal.App.4th at page 1002, the reviewing court found a conflict of interest when the prosecutor threatened, before trial, to prosecute both the defense investigator and defense counsel because the defense investigator was apparently not licensed. The court concluded that the conflict of interest was "real, not theoretical," observing: "Any trial counsel in a criminal case who is worried that the prosecutor is scrutinizing his or her actions for possible criminal investigation and prosecution has a conflict with the interest of representing the client zealously—he or she does not want to antagonize the prosecutor." (*Ibid.*) The court then proceeded to analyze whether the defendant had met his burden to show that unconflicted counsel would have done more for him, and that defense counsel had " 'pull[ed] his punches.' " (*Ibid.*) We will do the same here, assuming for the sake of argument that an actual (or "real") conflict of interest arose from the charging of Femino, and consider whether that conflict adversely affected her performance, and, where necessary, whether counsel's performance resulted in actual prejudice to defendant. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166-167; *People v. Mai* (2013) 57 Cal.4th 986, 1009-1010; *Doolin*, *supra,* 45 Cal.4th at pp. 417-421.)

12

C. *Deficient Performance and Prejudice*

1. *Femino's Failure to Inform the Court of the Conflict*

Defendant contends Femino's conflict of interest adversely affected her performance because she failed to inform the trial court of the conflict. (See *Halloway v. Arkansas* (1978) 435 U.S. 475, 485-486 ["defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem"].) He argues that Femino failed to request an inquiry into her conflict because she had a personal and financial interest in avoiding any investigation into Ashford's threats, which concerned Ashford's demands that defendant pay Femino's fees, and would have lowered her chances of receiving a favorable disposition of her criminal charges. However, while Femino did not inform the trial court that she was being prosecuted by the same agency that was prosecuting defendant (the prosecutor informed the court on the second day of trial),[4] the record does not support defendant's argument that Femino sought to avoid an investigation into possible threats made by Ashford due to her personal and financial interest.

Initially, we observe that there *was* an investigation into, and a discussion of, the alleged threats during trial, and at that time there was no evidence that any threats had occurred. Indeed, there was evidence to the contrary, presented by defendant himself. Lieutenant Barkley informed the court only that defendant "may have been" threatened by Ashford "a couple weeks ago," but he added that "it sounds like it's resolved." Femino, appearing to echo Barkley's sentiment, added, "There was no issue." The prosecutor then acknowledged that he, too, "[did not] know the truth of this [the allegations]," but invited the court to question defendant outside of Femino's presence. When the court sought to confirm the prosecutor's request that Femino step outside so defendant could speak freely, defendant responded, "I'm not going to speak without my

---

[4] We note that the trial judge, Corie Caraway, was recused from presiding over Femino's criminal case under Code of Civil Procedure section 170.1.

13

counsel present, Your Honor." When it was Femino's turn to address the issue, she invited defendant to speak, provided he felt comfortable doing so. Defendant responded that he did not feel threatened, and did not have any issues in the housing unit. In the absence of any evidence that any threats had occurred aside from Barkley's and the prosecutor's admittedly uninformed statements, the trial court determined there was no need for further inquiry.

Defendant argues that he did not feel comfortable speaking about the threats while he was housed with Ashford. But he did not raise a similar concern during trial. At trial, he expressly stated that he had *not* been threatened as well as made an unprompted comment during the prosecutor's argument that he would refuse to speak about any potential threats without Femino present. Moreover, there is nothing in the record to suggest that defendant raised those issues or requested to move to a different housing unit when jail staff asked him about Ashford's possible threats. There is no indication that defendant sought to replace Femino as his retained counsel prior to the date he first appeared for sentencing. Indeed, defendant's statements and conduct during trial indicated only that he had *not* been threatened by Ashford or anyone else.

Additionally, any demand by Femino into Ashford's possible threats would have been directly contrary to defendant's stated concerns. Specifically, when the issue of the possible threats was first raised, defendant stated that he had no problems in the housing unit, but he *was* concerned about what problems the investigator might have created by speaking with other inmates housed in the unit. When Femino returned to the issue the day after defendant had been questioned by jail staff, she noted that she had spoken with defendant "and the potential danger [the questioning] could have put him in." She added that the questioning of defendant by jail staff "could potentially have caused him issues," echoing the concern defendant had raised the previous day.

14

Further, even if Femino had disregarded defendant's stated concerns as well as the absence of evidence that any threats had occurred, and demanded further investigation into the possible threats, the trial court likely would have done what it did here:  deny the request as moot based on defendant's confirmation that he had not been threatened and had no issues in the housing unit.

In sum, there was no evidence that any threats had occurred, requesting further inquiry into the possible threats would have been contrary to defendant's stated interests, and the trial court would almost certainly have denied such a request had it been made. Accordingly, we cannot conclude that Femino's conflict of interest adversely affected her performance on the basis that she did not inform the trial court of her conflict of interest in an attempt to shield herself from an inquiry into Ashford's possible threats.

### 2. *Motion to Change Venue*

Defendant next argues that absent Femino's deficient performance arising from her conflict of interest, it was reasonably probable the result of the proceeding would have been different.  However, as we will explain, defendant's arguments fail to demonstrate either deficient performance or prejudice.

Defendant first contends Femino's decision to withdraw a motion to change venue fell below an objective standard of reasonableness, and there was no conceivable tactical reason for withdrawing the motion.

*Background*

On May 10, 2022, following a preliminary hearing, defendant was held to answer on the charges in the complaint, without bail.  A week later, he pleaded not guilty to all counts and entered a no time waiver; the court set a jury trial for July 18.  On June 22, the court appointed the public defender to represent defendant in a new case that had been

15

filed regarding defendant's failure to appear at a hearing in March.[5] We set forth the facts related to that case, *ante*.

On July 6, the trial court held a trial readiness conference, and arraigned defendant on the case involving his failure to appear. Defendant indicated that he had retained Femino to represent him in that case. At that hearing, previous defense counsel Rooney indicated that he was preparing a change of venue motion. The court asked whether the trial date would need to be moved. Rooney responded that defendant wished to keep the current trial date against his legal advice; Rooney noted that he had several subpoenas that had not yet been served. Rooney further informed the court that he had spoken with a potential expert witness who had not reviewed sufficient material to render an opinion, that they were waiting for documents coming from out of state, and that there might not be enough time for the expert to analyze the documents. Rooney stated that he had warned defendant regarding those issues, but nevertheless "we're doing everything we can to push this forward, to go forward on [the] trial date."

Defendant stated his desire for all his cases to be heard together. The court and prosecutor agreed, and the prosecutor stated her intent to conduct the preliminary hearing on the failure to appear case the following week, with a trial readiness regarding the consolidated matter to follow. The prosecutor indicated she would move to consolidate defendant's cases following the preliminary hearing. Rooney indicated that he was not opposing the motion against his better judgment and against his legal advice because defendant had directed him to not oppose the motion.

Two days later, Rooney filed the motion to change venue. The motion argued a reasonable likelihood that defendant would not receive a fair and impartial trial in Butte County on the basis that he was charged with committing fraud in a disaster zone following the Camp Fire (which had tragically affected much of the community that

---

[5] In May, the cases regarding defendant's dealings with Nor Cal and his false document case had been consolidated.

16

would comprise defendant's jury), defendant's case had been highly publicized, and the relatively small population of Butte County. The motion requested that the court grant a change of venue, or, in the alternative, postpone its ruling until an attempt was made to impanel a fair and impartial jury. (See Rules of Court, rule 4.151(b) [transferring court should consider impaneling a jury before ordering a change of venue, unless there is clear evidence of a reasonable likelihood that a fair and impartial trial cannot be had in the county].)

On July 13, Femino substituted for Rooney as defendant's counsel of record. The prosecutor consolidated the charges against defendant. The court continued the matter to July 27 for a venue hearing.

On July 27, Femino withdrew the change of venue motion. She requested that defendant be released on bail or on his own recognizance, which the court denied. Regarding the trial date, Femino noted that defendant "wants the soonest date possible." The prosecutor requested September 26, and Femino requested August 29. The court reset the jury trial for September 26 with no time waiver and set a trial readiness conference on September 14.

On September 14, Femino requested to continue the readiness conference by a week and informed the court there were "several" motions that "should have been" filed that day, including a motion to disqualify the presiding judge, a motion to dismiss for lack of speedy trial, a motion to dismiss for prosecutorial misconduct, a motion to dismiss for vindictive prosecution, and a motion to set aside the information pursuant to Penal Code section 995. Femino also noted that the prosecution had made a new offer to defendant, which she had discussed with defendant briefly but wanted to discuss further.

The prosecutor observed that Femino had been the attorney of record since July 13--nine weeks earlier--and had only just filed several substantive motions requiring response from the prosecution. The prosecutor represented that she had not yet received the motions and was only aware of them based on Femino's representations that they had

17

been filed. The court asked Femino whether she was requesting to continue the matter and vacate the trial date. Femino responded that defendant did not want to waive time and preferred to proceed with trial even if the motions were deemed untimely filed.

After a continuance, the court confirmed that no motions had yet been filed; Femino responded that she had asked her staff to e-file and serve the motions that day. The court asked Femino whether she was aware that a motion to disqualify (the presiding judge) under Code of Civil Procedure section 170.1 would not be heard before the trial date and would require a continuance. Femino responded that she was aware the motion could require a continuance. The court observed that defendant had previously "been very clear that he does not want this matter continued," and had indicated that he did not want to waive time. Defendant stated that he would speak with Femino about how to proceed, and the court continued the readiness conference to September 21.

On September 21, the court set a trial assignment conference to take place the next day, and on September 22, the court set a further trial readiness conference for September 28 and reset trial to begin on October 3. Defendant entered a limited time waiver to that date. Trial began on October 3. There is nothing to indicate that Femino filed the motions she had indicated the intent to file.

*Analysis*

Defendant argues the decision to withdraw the motion to change venue fell below an objective standard of reasonableness, and there was no conceivable tactical reason for the motion's withdrawal. The Attorney General counters that Femino likely did not pursue a change of venue because defendant was anxious to go to trial and had entered a "no time waiver" status. Defendant responds that Femino could not reasonably decline to argue a change of venue motion due to the waiver because she intended to argue several other motions, the change of venue motion had already been filed, the motion was meritorious, and the motion would not frustrate defendant's desire not to waive time. The Attorney General has the better argument.

18

Defendant made it abundantly clear throughout the proceedings that he wanted trial to take place as soon as possible. Indeed, defendant was willing to forgo securing his own expert witness, and he directed Rooney to not oppose consolidation against counsel's advice. Rooney clarified that "we're doing everything we can to push this forward, to go forward on [the] trial date." When Femino indicated that she intended to file several substantive motions, she specified that defendant would prefer to have the motions be deemed untimely than to continue trial to allow the motions to be heard. Similarly, when Femino stated her intent to file a motion to disqualify, the court reminded her that such a motion would require a continuance, and that defendant had previously "been very clear that he does not want this matter continued." Femino did not file that motion, or any of the other substantive motions she intended to file. Specifically, regarding the motion to change venue, Femino noted when withdrawing the motion that defendant "wants the soonest [trial] date possible." Accordingly, while Femino stated her intent to file other motions, she recognized that defendant's paramount concern was that the trial not be delayed for their consideration.

Based on defendant's stated desire to proceed to trial as soon as possible, there was clearly a tactical reason for Femino to withdraw the motion to change venue, given the possibility that deciding the motion could result in a delay of trial. Indeed, even had the trial court postponed its ruling until after an attempt was made to impanel a jury, as the motion had requested in the alternative, a ruling in defendant's favor would have delayed trial. Defendant had made clear that he preferred to press ahead with trial even when doing so was adverse to his legal interest and against counsel's advice. In that context, Femino's withdrawal of the venue change motion did not constitute ineffective assistance.

19

### 3. *Femino's Alleged Failure to Adequately Investigate*

Defendant next argues Femino's performance was deficient and prejudicial because she failed to adequately investigate defendant's relationship with his former bookkeeper Sarah Curtis.

*Background*

During her trial testimony, Curtis explained that she and defendant had been in a romantic relationship that began in March or April 2021, and ended in October of that year. In June, Curtis and her family moved from their home in Utah to defendant's home in Colorado so she could be with him. Curtis began working as a bookkeeper for defendant's business Mesa Ag, which she helped to rename Colorado-Rock LLC. After their relationship ended in October, she continued to work for defendant as his bookkeeper, and they were still in contact in March and April 2022. Curtis testified that in March 2022, defendant did not have a place to stay, and he had threatened to harass her children and wreck her career if she did not allow him to stay at her house and watch her seven-year-old child when she was away on a business trip.

On cross-examination, Femino asked Curtis whether she and defendant had spent the Christmas holidays in 2021 with defendant's mother. The prosecutor objected on relevance grounds. During a sidebar, Femino explained that she intended to impeach Curtis's testimony that she ended the relationship with defendant by eliciting testimony that she spent Christmas with defendant and his mother. Curtis then testified that she spent Christmas Eve and Christmas with defendant and his mother, who had flown in from Texas.

On redirect examination, the prosecutor asked Curtis whether she had ended her relationship with defendant on good terms. Curtis answered that she ended the relationship "because [defendant] strangled [her] and almost killed [her]." Curtis elaborated that she had to continue talking to and working with defendant due to his "threats and demands and stalking and blackmailing [her]." She stated that defendant

20

told her he would ruin her career, ruin her children, and kill her and leave her in a Nevada desert if she did not comply.

After a break, Femino argued that she was improperly prohibited from eliciting Curtis's testimony that she had referred to defendant's mother as " 'Mom' " during the Christmas holiday, and that law enforcement was called and had to remove Curtis from the home on Christmas Eve that year because she was screaming at everyone in the residence. Femino argued that evidence was probative of Curtis's credibility and her motive for providing the testimony she had, and the impeachment evidence had become especially probative after Curtis's testimony that defendant strangled her.

Femino added that she was unaware Curtis would testify to being strangled because law enforcement had not been contacted following that incident, and she had received no information or pretrial discovery regarding the incident.[6] Femino requested a mistrial, or, in the alternative, to exclude evidence that defendant had previously been convicted of stalking. The trial court denied the request, determining that Femino had opened the door to Curtis's disclosure by asking why Curtis continued to associate with defendant by going to his home for Christmas. Femino subsequently observed that Curtis had already testified on direct examination that she felt threatened by defendant and that defendant had blackmailed her.

On recross-examination, Curtis testified that she did not call the police after defendant assaulted her, but she did file a police report sometime after defendant was arrested in April 2022. She never received a copy of the police report, but she had informed the Butte County District Attorney's Office that there was a police report made sometime between April and June 2022.

---

[6] The prosecutor stated that he had interviewed Curtis the night before her testimony, after she had arrived in California from out of state and had disclosed that interview to Femino. Femino responded that she had not received the recording until after she had arrived at trial that day and, at the time of the argument, had still not been able to listen to the recording.

*Analysis*

On appeal, defendant now argues Femino's failure to investigate defendant's relationship with Curtis constituted deficient performance. He points out that Femino knew Curtis might testify at trial and that defendant's relationship with Curtis had been tumultuous, observing that Femino had been provided a recording of a phone call between defendant and Curtis in which defendant had threatened her.[7] He argues that competent counsel would have investigated defendant's relationship with Curtis in order make reasonably informed tactical decisions pertaining to the exclusion of irrelevant, potentially damaging evidence.

But here, there is no basis to conclude that Femino did *not* investigate defendant's relationship with Curtis. Femino extensively cross-examined Curtis on her memory, poor judgment, bad decisions, and personal bias against defendant. With respect to the alleged assault, Femino had no way to know that the incident had occurred (other than from defendant). Femino had attempted to contact Curtis, but Curtis did not return her phone calls. Information regarding the incident was not timely provided in discovery, despite Curtis's testimony that she had informed the district attorney's office that she had filed a police report regarding the incident sometime between April and June 2022. There is nothing to suggest that defendant told Femino about the incident, or indicated to her that Curtis might testify about it if given the opportunity. Femino reasonably sought to elicit impeachment testimony suggesting that Curtis's and defendant's relationship had not ended the way Curtis had testified that it had. There is nothing to suggest that Femino was or should have been informed by the time of the testimony that defendant had

---

[7] Femino observed that the phone call was not a jail phone call, and she did not know where the recording came from or whether defendant was aware that he was being recorded. The prosecutor confirmed that Curtis had recorded a disagreement between she and defendant. The trial court excluded the evidence pursuant to Evidence Code section 352.

assaulted Curtis, or that Curtis would testify about that incident. No ineffectiveness appears.

## II

### *Trial Court's Duty to Inquire*

Finally, defendant contends the trial court prejudicially erred by failing to properly inquire into Femino's conflict of interest after the prosecutor had informed the court that Femino was being prosecuted by the same agency prosecuting defendant, depriving him of his right to effective assistance of counsel and due process.

"When the trial court knows, or reasonably should know, of the possibility that defense counsel has a conflict of interest, it has a duty to inquire into the matter." (*People v. Wilson* (2023) 14 Cal.5th 839, 862.) However, " '[w]hen a defendant claims that a trial court's inquiry into a potential conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance.' [Citations.] 'Absent a demonstration of prejudice, we will not remand to the trial court for further inquiry.' " (*Ibid.*) In other words, where a trial court fails to inquire regarding a conflict of interest, reversal is only required where the reviewing court concludes that counsel provided ineffective assistance due to the conflict. (*Mickens v. Taylor*, *supra*, 535 U.S. at pp. 164, 174.)

Here, as we have explained, defendant has failed to demonstrate that Femino provided ineffective assistance due to the conflict. Accordingly, his final claim also fails.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, J.

We concur:

/s/
Mauro, Acting P. J.

/s/
Renner, J.